Rockingham
No. 2007-179

GRAND CHINA, INC. *& a.*

v.

UNITED NATIONAL INSURANCE COMPANY

Argued: September 19, 2007
Opinion Issued: November 9, 2007

*Steven G. Shadallah* and *Stephen E. Woodbury*, of Salem (*Mr. Shadallah* and *Mr. Woodbury* on the brief, and *Mr. Shadallah* orally), for Grand China, Inc.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Margaret H. Nelson* and *Martin L. Gross* on the brief, and *Margaret H. Nelson* orally), for the respondent.

*Upton & Hatfield, LLP*, of Portsmouth (*Russell F. Hilliard* on the brief and orally), for the intervenor.

*Kelly A. Ayotte*, attorney general (*Glenn A. Perlow*, assistant attorney general, on the brief), for the New Hampshire Insurance Department, as *amicus curiae*.

*Devine, Millimet & Branch, P.A.*, of Concord (*Paula T. Rogers* and *Holly J. Kilibarda* on the brief), for The Property Casualty Insurers Association of America, as *amicus curiae*.

William K.S. Lim, Yuen Sim N.G. Lim and Dharma Lim filed no brief.

DALIANIS, J. The respondent, United National Insurance Company (UNIC), appeals from the order of the Superior Court (*Morrill*, J.) granting partial summary judgment to the petitioner Grand China, Inc. (Grand China). We affirm.

The trial court found as follows: Grand China is a restaurant in Salem, owned and operated by petitioners William K.S. Lim, Yuen Sim N.G. Lim and Dharma Lim. For more than twenty-five years, the Lims have purchased liability insurance through the intervenor, Michals Insurance Agency, Inc. (Michals). UNIC, a surplus lines insurer, provided Grand China's liquor liability policy. The relevant policy period was July 1, 2003, through June 30, 2004, and the policy required UNIC to give Grand China ten days written notice of cancellation.

On November 12, 2003, UNIC sent a notice of cancellation to Grand China, stating its intent to cancel the policy effective December 1, 2003, for "non-payment and underwriting reasons." Thereafter, UNIC issued a cancellation endorsement, purporting to cancel the policy, and returned the unused premium.

On December 13, 2003, a patron of Grand China allegedly caused an accident in which one person was killed and another injured. Both the injured party and the estate of the deceased party sued Grand China, alleging a breach of a duty of care by serving alcohol to the patron.

Grand China provided timely notice of the suit to UNIC; however, UNIC denied coverage, claiming that it had cancelled the policy before the December 13 accident. Grand China then filed a declaratory judgment

petition seeking a determination that UNIC is obligated to defend and indemnify it. Grand China moved for partial summary judgment, arguing that UNIC's cancellation of the policy was ineffective because it was not sent sixty days before the purported cancellation date, as required by RSA 417-C:2 (2006). The trial court ruled in Grand China's favor, and this appeal followed.

In reviewing the superior court's summary judgment rulings, we consider the evidence in the light most favorable to the non-moving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. *N.H. Ins. Guaranty Assoc. v. Elliot Hosp.*, 154 N.H. 571, 574 (2006). We review a trial court's application of law to facts *de novo. Gordonville Corp. v. LR1-A Ltd. P'ship*, 151 N.H. 371, 373 (2004).

In matters of statutory interpretation we are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 33 (2007). We do not consider words and phrases in isolation, but rather within the context of the statute as a whole. *Gordonville Corp.*, 151 N.H. at 373. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.* When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes. *Soraghan v. Mt. Cranmore Ski Resort*, 152 N.H. 399, 405 (2005).

RSA chapter 417-C (2006) governs the cancellation of commercial insurance. The chapter specifically exempts "workers' compensation policies or any policies provided and controlled by RSA 417-A or RSA 417-B." RSA 417-C:6. Neither party claims that surplus lines insurance is governed by either RSA chapter 417-A (2006) or RSA chapter 417-B (2006), nor is the policy in question a workers' compensation policy.

RSA 417-C:2, I, provides in pertinent part: "No notice of cancellation of a . . . liability policy . . . shall be effective unless mailed . . . at least 60 days prior to the effective date of cancellation . . . ." The plain meaning of this statute is that, unless otherwise exempted, *all* liability insurers must comply with the sixty-day notice provision. UNIC's policy with Grand China covered liquor liability and, thus, was a liability policy within the meaning of the statute. Having failed to give sixty days notice of the policy cancellation, UNIC must defend and indemnify Grand China against claims arising out of the December 13, 2003 incident.

UNIC argues that it is exempt from RSA 417-C:2 because, as a surplus lines insurer, it has a special status under insurance laws. "Surplus lines insurance is often a source of last resort," 1 E. HOLMES & M. RHODES, HOLMES' APPLEMAN ON INSURANCE 2D § 2.17, at 325 (1996), covering liability for unusual risks that are outside of traditional markets and typically unavailable through state-authorized carriers. "Accordingly, the insured will generally be charged a substantial premium commensurate with the unusual or riskier nature of the risks assumed." *Id.*

UNIC argues that surplus lines insurance is subject to a different statutory framework from that which applies to other kinds of insurers. UNIC asserts that surplus lines insurers are governed exclusively by RSA chapter 405 (2006), and exempted from any other regulation by RSA chapter 406-B (2006).

Generally, an insurance company must be incorporated in New Hampshire and licensed through the insurance commissioner to transact business with New Hampshire consumers. *See* RSA 402:10-:12 (2006); RSA 405:1. However, several types of foreign, unlicensed insurers, including surplus lines insurers, may become authorized to offer policies through licensed and properly appointed producers. *See* RSA 405:1-:12, :17-b, :24; RSA 406-B:16. These producers may only offer policies from foreign insurers upon satisfying the insurance commissioner that the needed coverage is unavailable through an admitted insurer. *See* RSA 405:17-b, :24.

UNIC argues that the provisions of RSA chapter 405 constitute the only regulatory provisions governing surplus lines insurers. It mistakenly points to RSA 405:24 to demonstrate the legislature's intention to leave surplus lines insurance largely unregulated. RSA 405:24 explains how producers may obtain licenses and requires them to place the following disclaimer in a stamped form given to insured parties before issuing a policy:

> The company issuing this policy has not been licensed by the state of New Hampshire and the rates charged have not been approved by the commissioner of insurance. If the company issuing this policy becomes insolvent, the New Hampshire guaranty fund shall not be liable for any claims made against the policy.

RSA 405:24 (quotation omitted). This warning to potential insureds refers only to the rate-filing process and the New Hampshire guaranty fund. It does not state that unlicensed insurers, such as surplus lines insurers, are wholly unregulated or that they are subject to a separate statutory scheme.

Similarly, RSA chapter 406-B lends no support to UNIC's assertion that the legislature intended to exempt surplus lines insurers generally from insurance regulations. The purpose of RSA chapter 406-B is, rather, to protect the "many residents of this state hold[ing] policies of insurance issued by persons and insurers not authorized to do business in this state" by subjecting unauthorized insurers to New Hampshire laws. RSA 406-B:1. To that end, the chapter includes various provisions protecting New Hampshire residents. Surplus lines insurers, even though they are not licensed to do business within the state, are exempted from the provisions of the chapter under RSA 406-B:16, as long as the policies are "lawful[ly] transact[ed]." RSA 406-B:16; *see* RSA 406-B:8, :11.

UNIC also argues that the trial court disregarded the statutory scheme governing surplus lines insurers by viewing the reference in RSA 417-C:2 to "liability polic[ies]" in isolation. We disagree. No statutory provision concerning insurance contradicts our interpretation of RSA 417-C:2; nor, as discussed above, do we find that surplus lines insurers are governed by a separate framework.

UNIC further argues that there is no basis for concluding that surplus lines policies are subject to RSA 417-C:2 because the legislature never expressly included them. It relies upon *Bianco Professional Association v. Home Insurance Co.*, 144 N.H. 288, 297 (1999), to support its assertion that there is no express statutory directive to include surplus lines policies under RSA 417-C:2. To the contrary, RSA 417-C:2, I, expressly states that it applies to liability policies, and the policy at issue is a liability policy. We will not consider what the legislature might have said or add words to a statute that the legislature did not see fit to include. *Gordonville Corp.*, 151 N.H. at 373-74. If the legislature had intended to exclude surplus lines insurance from RSA 417-C:2, it could have done so. *See* RSA 417-C:6.

UNIC also argues that interpreting RSA 417-C:2 to govern surplus lines policies is inconsistent with public policy and will produce an absurd result. It asserts that applying RSA 417-C:2 to surplus lines policies will upset an existing balance in the marketplace, in which surplus lines insurers are free to set the terms for such coverage and policyholders are willing to accept these terms for this otherwise unavailable coverage. Thus, UNIC argues, our holding will have a chilling effect upon the surplus lines market, because few surplus lines insurers will offer these high risk policies if they must comply with RSA 417-C:2.

We discern no absurd result in concluding that surplus lines insurers must comply with the cancellation provision of RSA 417-C:2. The very scarcity of high risk policies places New Hampshire residents in a position of little bargaining power. If surplus lines insurers are unregulated in this

area, they would be at liberty to cancel policies without providing any notice. Further, because there are so few surplus lines insurers, New Hampshire residents may have difficulty procuring a replacement surplus lines policy after a cancellation even within the sixty-day notice period.

The New Hampshire legislature reasonably could have concluded that the competing policy interests favored including surplus lines insurers within RSA 417-C:2. It is not our function to reweigh these competing concerns. "We have consistently reserved matters of public policy for the legislature." *State v. Kidder*, 150 N.H. 600, 604 (2004) (citation omitted). Moreover, we note that to the extent that the New Hampshire legislature decided as a matter of public policy to regulate the cancellation requirements of surplus lines insurers, it is not the only legislature to have done so. *See, e.g.*, Conn. Gen. Stat. Ann. § 38a-324 (West Supp. 2007) (requiring surplus lines insurers to comply with the same notice provision imposed on other types of insurers); Me. Rev. Stat. Ann. tit. 24-A, § 2009-A (West 2000) (establishing a unique cancellation provision for surplus lines policies).

UNIC asks us to defer to the New Hampshire Insurance Department, which released a bulletin after the trial court's order interpreting RSA 417-C:2 as inapplicable to surplus lines insurers. *See* Bulletin INS No. 07-006-AB (Feb. 22, 2007). UNIC notes that we accord substantial deference to those administrative agencies responsible for administering regulations. *See Win-Tasch Corp. v. Town of Merrimack*, 120 N.H. 6, 9-10 (1980). However, we only accord substantial deference "given a statute of doubtful meaning." *Id.* (quotation omitted). Because we hold that surplus lines policies are clearly governed by RSA 417-C:2, we do not defer to the administrative agency in this case. *See Hansel v. City of Keene*, 138 N.H. 99, 104 (1993).

■ As the legislature could have exempted surplus lines insurers from RSA 417-C:2, but did not, *see* RSA 417-C:6, we will not contradict the statute's plain language. Because the cancellation notice was sent to Grand China fewer than sixty days before the effective date of cancellation, it was ineffective to cancel the policy.

UNIC finally argues that the trial court erroneously found that Michals was its authorized agent. In light of our holding that the cancellation of the policy was ineffective, we need not address this issue.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.