Plymouth Family Division
No. 2008-133

IN RE ALEXIS O.

Argued: September 11, 2008
Opinion Issued: October 29, 2008

*Kelly A. Ayotte*, attorney general (*Karen A. Schlitzer*, assistant attorney general, on the memorandum of law and orally), for the New Hampshire Division for Children, Youth and Families.

*Moir and Associates, P.C.*, of Concord (*Jeffrey A. Rabinowitz* on the brief and orally), for the mother.

DALIANIS, J. The natural mother, J.M., appeals the ruling of the Plymouth Family Division (*Rappa*, J.) that the Interstate Compact on the Placement of Children (ICPC), *see* RSA ch. 170-A (2002), applied to its decision allowing her to retrieve her daughter, Alexis O., from New Hampshire and return with her to Arizona, after having determined that the New Hampshire Division for Children, Youth and Families (DCYF) failed to prove that the mother had neglected her. The trial court ruled that

because the ICPC applied, it could not allow the mother to take her daughter to Arizona until Arizona authorities had notified DCYF that this placement did not appear to be contrary to the child's interests. *See* RSA 170-A:1, Article III(d). We reverse and remand.

## I

The trial court found the following facts. The child, born on February 27, 2007, lived with her natural parents in Arizona. In September 2007, the parents agreed that the father would relocate with her to New Hampshire. The father arrived in Concord with one baby bottle, a car seat and some baby clothes; he had neither money nor food. The Concord Police Department contacted DCYF, which determined that the child was healthy. DCYF directed the father to a homeless shelter and called the mother to confirm that she knew that the child was in New Hampshire with her father. The mother acknowledged that she had allowed the father to take the child to New Hampshire, but expressed concerns about his ability to care for her.

The father and child lived at a homeless shelter in Plymouth from September 26, 2007, through November 30, 2007. As time went on, the father would leave the child alone without notifying anyone. This led to a second referral to DCYF, which determined that the referral was unfounded.

Eventually, the father was asked to leave the Plymouth shelter and was relocated to a shelter in Concord. Rather than take his daughter with him, he left her with an acquaintance and made no provision for her long term care. After several days, the acquaintance called DCYF. DCYF subsequently brought neglect petitions against both parents.

Following an adjudicatory hearing, the trial court found that the father, but not the mother, had neglected the daughter. With regard to the father, the trial court found that he neglected his daughter when, instead of taking her with him to the shelter in Concord, he left her with his acquaintance.

With respect to the mother, the court found that, contrary to DCYF's allegations, when first contacted by DCYF, she immediately offered to retrieve the child; however, DCYF elected not to pursue this option. The court further found that the mother's failure to return DCYF's later calls did not constitute neglect. The trial court ruled that "[u]nless DCYF can confirm that there is an order from a court of competent jurisdiction prohibiting her from doing so, [the mother] may retrieve the child as soon as possible." The court set the matter for a dispositional hearing, but stated that if the mother "retrieves the child and returns to Arizona, this case shall be closed without further hearing." In the meantime, the court awarded DCYF legal custody of the child, and DCYF placed the child in foster care.

DCYF moved for reconsideration, asserting for the first time that the ICPC applied. Following a hearing, the trial court granted the motion, ruling that pursuant to the ICPC, it could not allow the mother to retrieve her daughter until DCYF had requested, and Arizona authorities had completed, a home study and reported that allowing the daughter to live with her did not appear to be contrary to the daughter's interests. This appeal followed.

The mother argues that the ICPC does not apply because allowing her to care for her child in Arizona is not a "placement." *See* RSA 170-A:1, Article II(d). The State counters that because the trial court assumed jurisdiction over the child and gave DCYF legal custody over her, the ICPC applies to its decision to place the child with her mother in Arizona.

These issues present questions of first impression for this court. Courts in other jurisdictions considering similar questions are divided. *Compare McComb v. Wambaugh*, 934 F.2d 474, 482 (3d Cir. 1991) (ICPC does not apply to out-of-state placement of child with natural parent), with *Arizona Dept. of Economic Sec. v. Leonardo*, 22 P.3d 513, 522 (Ariz. Ct. App. 2001) (ICPC applies to out-of-state placement of child with natural parent). Resolving these issues requires that we interpret the ICPC. The interpretation of a statute is a question of law, which we review *de novo. N.H. Dep't of Envtl. Servs. v. Marino*, 155 N.H. 709, 713 (2007).

## II

### A

Interstate compacts, like the ICPC, "are formal agreements among and between states that have the characteristics of both statutory law and contractual agreements. They are enacted by state legislatures that adopt reciprocal laws that substantively mirror one another." AMERICAN PUBLIC HUMAN SERVICES ASSOCIATION, UNDERSTANDING INTERSTATE COMPACTS, available at http: //www.aphsa.org/Policy/ICPC-REWRITE/Understanding %20Interstate%20Compacts/UNDERSTANDING%20INTERSTATE%20 COMPACTS.pdf. The ICPC has been enacted in all fifty states, the District of Columbia and the U.S. Virgin Islands. Annotation, *Construction and Application of the Interstate Compact on the Placement of Children*, 5 A.L.R. 6TH 193, 208 (2005). New Hampshire enacted it in 1965. *See* Laws 1965, 366:1.

■■ "Since compacts are a statute in each of the jurisdictions that are party to it, the entire body of legal principles applicable to the interpretation of statutes also applies to the interpretation of compacts." AMERICAN PUBLIC HUMAN SERVICES ASSOCIATION, UNDERSTANDING INTERSTATE COMPACTS, *supra.* Further, although interstate compacts for which Con-

gressional consent is required are deemed to be federal laws subject to federal construction, *see State v. Brown*, 157 N.H. 555, 557 (2008), no such consent is required for or has been given to the ICPC. *McComb*, 934 F.2d at 479. The ICPC, thus, is construed as state law. *Id.* We, therefore, apply our ordinary rules of statutory construction to its interpretation.

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Tonnenson v. Town of Gilmanton*, 156 N.H. 813, 814 (2008). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We will review legislative history, however, to aid our analysis where the statutory language is ambiguous or subject to more than one reasonable interpretation. *Franklin v. Town of Newport*, 151 N.H. 508, 510 (2004). We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. *Id.* Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. *Grand China v. United Nat'l Ins. Co.*, 156 N.H. 429, 431 (2007). This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.*

### B

"The ICPC . . . governs the relations between states when decisions are made as to where to place a dependent child." *In re D.N.*, 858 So. 2d 1087, 1093 (Fla. Dist. Ct. App. 2003). It consists of ten articles, identical in all member states, *see* Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 NEB. L. REV. 292, 297 (1989), "that define the types of placements subject to [it], the procedures to be followed in making an interstate placement, and [its] specific protections, services and requirements," Annotation, *supra* at 208-09. "The Compact Administrator in each member state coordinates ICPC matters within that state." Eiseman, *Recent Decisions: The Maryland Court of Appeals*, 58 MD. L. REV. 604, 629 (1999); *see* RSA 170-A:1, Article VII.

▪ Under the ICPC, the "compact administrator in the 'sending state' recommends a placement and provides the 'receiving state' with information concerning the proposed placement. The ICPC compact administrator in the 'receiving state' then determines whether, in his or her opinion, the placement is appropriate." *In re D.N.*, 858 So. 2d at 1093 (citation omitted). "In essence, the ICPC requires that its procedures be followed in order to

obtain the receiving state's permission for placement before the child is sent to the receiving state for purposes of foster care or adoption." Hartfield, *supra* at 298 (emphasis omitted); *see In re Larry B.*, 125 N.H. 376, 379 (1984).

To determine whether the ICPC applies to the mother's situation, we begin by construing its plain language. The stated purposes of the ICPC are to foster cooperation and information sharing among the member states so as to ensure that children requiring placement "receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." RSA 170-A:1, Article I. The ICPC's provisions are to "be liberally construed to effectuate the purposes thereof." RSA 170-A:1, Article X.

Article II(d) of the ICPC defines a "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." RSA 170-A:1, Article II(d).

Article III sets out the four requirements for a valid placement. Under Article III(a), no "sending agency," defined in Article II(b) to include a court, "shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption" unless the sending agency complies with the ICPC. RSA 170-A:1, Article III(a). Before a sending agency sends, brings or causes a child to be brought into a receiving state for placement in foster care or as a preliminary to adoption, the sending agency must notify the receiving state, *see* RSA 170-A:1, Article III(b), and provide such documents as may be necessary to carry out the ICPC's purposes, *see* RSA 170-A:1, Article III(c). Pursuant to Article III(d), a child cannot be "sent, brought, or caused to be brought into the receiving state" until the receiving state notifies the sending agency in writing that "the proposed placement does not appear to be contrary to the interests of the child." RSA 170-A:1, Article III(d).

Article V of the ICPC governs when a sending agency must retain jurisdiction. It states, in pertinent part, that the "sending agency shall retain jurisdiction over the child sufficient to determine all matters" related to the child's custody, supervision, care, treatment and disposition, "until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state." RSA 170-A:1, Article V(a). Moreover, under this article,

the sending agency "shall continue to have financial responsibility" for the child's support and maintenance "during the period of placement." *Id.*

Article VIII(a) exempts the following from the ICPC: where the child's "*parent,* step-parent, grandparent, adult brother or sister, adult uncle or aunt or his guardian" sends or brings the child into the receiving state "and leave[s] the child with any such relative or nonagency guardian in the receiving state." RSA 170-A:1, Article VIII(a) (emphasis added). Other provisions of the ICPC deal with penalties, institutional care of delinquent children, the compact administrator, enactment, withdrawal, and severability. RSA 170-A:1, Articles IV, VI, VII, IX, X.

## C

█ "We are persuaded that read as a whole the Compact was intended only to govern placing children in substitute arrangements for parental care." *McComb,* 934 F.2d at 482. It was not intended to apply "when a child is returned by the sending state to a natural parent residing in another state." *Id.*

The limited scope of the ICPC is evident throughout its provisions. "The most significant and, to our minds, determinative language is found in Article III(a)." *Id.* This provision carefully restricts the reach of the ICPC to foster care or dispositions preliminary to adoption. *Id.* Under this provision, a sending agency may not send a child "for placement in foster care or as a preliminary to a possible adoption," unless it complies with the ICPC. RSA 170-A:1, Article III(a).

█ The definition of a "placement" further evinces this intent. As defined by the ICPC, a placement pertains *only* to substitutes for parental care. It does not apply to care for a child by his or her natural parent. A "placement" under the ICPC is an arrangement for care in a "family free" home, a boarding home, a child caring agency or institution. RSA 170-A:1, Article II(d). Although the term "family free" home is not defined, in context it refers to a home that provides care for a child similar to that which a family would provide, but that, unlike a boarding home, charges no fee for this care. *See* Hartfield, *supra* at 298. The care in a "family free" home is provided for free, while compensation is given to a boarding home. *See id.* Further, the stated purposes of the ICPC demonstrate that its primary function "is to protect children by requiring procedures to be followed in making and maintaining placements for children awaiting foster care and permanent adoptive homes." Eiseman, *supra* at 628. "The plain language of these provisions evinces the intent of the drafters to respect the integrity of the family and to allow parents to plan for the care of their own children unless the children were being placed in foster care or were

being adopted." Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 YALE L. & POL'Y REV. 63, 70-71 (2006-07).

To apply the ICPC to the return of a child to her natural parent would lead to anomalous results. Under Article V, for instance, the sending state would continue to have a duty to support the child, notwithstanding the "traditional duty of natural parents to support their children." *State DYFS v. K.F.*, 803 A.2d 721, 727 (N.J. Super. Ct. 2002).

■ Although we believe that the language of the ICPC is unambiguous, to the extent that it can be argued otherwise, *see* Sankaran, *supra* at 69, we look to legislative history to aid our analysis. *See Appeal of Malouin*, 155 N.H. 545, 549 (2007). The ICPC traces its roots to a small group of social service administrators in the 1950s, who were troubled by the problems associated with interstate adoption and foster care placements. Eiseman, *supra* at 628. At that time, states had no authority to order services for children who were at one time in their jurisdiction but who subsequently were transferred to a home in another state. Annotation, *supra* at 208. The administrators identified several concerns: (1) the failure of existing statutes to protect children moved interstate; (2) the territorial limitation of a state's jurisdiction and the powerlessness of the state from which the child was sent to ensure that proper care and supervision were provided in another state; and (3) the absence of a means to compel the state to which the child was sent to provide services in support of the placement. Hartfield, *supra* at 295. "Toward this end, the ICPC extends jurisdiction of a party state into the border of another party state to allow for investigation of a proposed placement prior to adoption or foster care, and supervision of that placement once it has been made." Eiseman, *supra* at 628. The ICPC was designed to accomplish four objectives: (1) maximizing the opportunity for placing a child; (2) maximizing information for the receiving state; (3) maximizing information for the state from which the child was sent; and (4) resolving jurisdictional conflicts. Hartfield, *supra* at 296; *see* RSA 170-A:1, Article I.

"The detailed draftsman's notes, supplied by the Council of State Governments, reinforce the notion that the [ICPC] does not apply to parental placements." *McComb*, 934 F.2d at 481. These notes explain that the ICPC "exempts certain close relatives. This was done in order to protect the social and legal rights of the family and because it is recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control." *Id.* (quotation omitted).

■ "The Council's desire to avoid entanglement with the natural rights of families is consistent with the limited circumstances that justify a state's interference with family life." *Id.* Biological and adoptive parents have a fundamental liberty interest protected by Part I, Article 2 of the New Hampshire Constitution in raising and caring for their children. *In the Matter of Jeffrey G. & Janette P.*, 153 N.H. 200, 203 (2006). The Due Process Clause of the Federal Constitution also protects this right. *Id.*; *see Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). This right "does not evaporate simply because [the parents] have not been model parents." *In the Matter of Jeffrey G.*, 153 N.H. at 204 (quotation omitted.) Accordingly, biological and adoptive parents are, therefore, "presumed to be fit parents," even if they have less than ideal parenting skills, "until they are found to be unfit" in an abuse/neglect proceeding or a termination of parental rights proceeding. *Id.*

■ The ICPC's history confirms that its drafters intended it to apply only to placement of a child for foster care or as a preliminary to adoption. The drafters did not intend for it to apply to natural parents.

## D

The State urges that we defer to the long-standing interpretation of the ICPC by the Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC). *See Appeal of N.H. Dep't of Transportation*, 152 N.H. 565, 573 (2005). We decline to do so because we conclude that even if the regulation upon which the State relies, Regulation No. 3, were to apply, it conflicts with the plain language of the ICPC and is, thus, invalid. *See In re Richard M.*, 127 N.H. 12, 18 (1985).

The AAICPC was formed in 1974 by compact administrators in each state to provide technical assistance and support to member states. Sankaran, *supra* at 71. The AAICPC then enlisted the assistance of the American Public Human Services Agency (APHSA), which is a non-profit organization that represents a number of state interests in the health and human services field, to act as the AAICPC's secretariat and administer the ICPC. *Id.* The APHSA has issued advisory opinions and model regulations, none of which are legally binding. *Id.* at 71-72. *But see Leonardo*, 22 P.3d at 519 (ruling that model regulation was binding so long as it was consistent with the purpose and policy of the ICPC). Most states, including New Hampshire, have not adopted the model regulations. *See* Sankaran, *supra* at 77.

Regulation No. 3, effective July 2, 2001, is entitled "Placements with Parents, Relatives, Non-agency Guardians, and Non-family Settings." *See* Association of Administrators of the Interstate Compact on the Placement

of Children, *ICPC Regulations*, available at http://icpc.aphsa.org/Home/ regulations.asp (*ICPC Regulations*). It expands the scope of the ICPC by broadly interpreting limiting terms such as "placement" and "foster care." Sankaran, *supra* at 72. For instance, Regulation No. 3(1) defines a placement under the ICPC to include "the arrangement for the care of a child in the home of his parent." *ICPC Regulations, supra.* Regulation No. 3 even goes so far as to include the care of a child by his natural parent in the definition of "foster care." Under Regulation No. 3(5), "if 24-hour-a-day care is provided by the child's parent(s) by reason of a court-ordered placement (and not by virtue of the parent-child relationship), the care is foster care." *Id.* Pursuant to Regulation No. 3(6)(b), notwithstanding the above provisions, the ICPC "does not apply whenever a court transfers the child to a non-custodial parent with respect to whom the court does not have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child." *Id.*

The State contends that, under Regulation No. 3, the ICPC applies to placement of a child with his or her natural parent. The State further asserts that the exception set forth in Regulation No. 3(6)(b) does not apply because in this case the court retained jurisdiction over the child before transferring her to the mother.

Regulation No. 3, however, is of no effect in New Hampshire. It has not been adopted here and was not promulgated pursuant to our statutes governing the adoption of regulations. *See H.P. v. Department of Children and Families*, 838 So. 2d 583, 585 n.3 (Fla. Dist. Ct. App. 2003). Moreover, even if it can be argued that by entering into the ICPC, New Hampshire has implicitly agreed to accept and be bound by the model regulations, *see Leonardo*, 22 P.3d at 518, Regulation No. 3 impermissibly expands the limited scope of the ICPC and, therefore, is invalid. *See McComb*, 934 F.2d at 481.

Rules adopted by administrative entities "may not add to, detract from, or in any way modify statutory law." *Kimball v. N.H. Bd. of Accountancy*, 118 N.H. 567, 568 (1978). Administrative regulations that contradict the terms of a governing statute exceed the agency's authority, and are void. *WMUR Channel Nine v. N.H. Dep't of Fish & Game*, 154 N.H. 46, 49 (2006). Here, the scope of the ICPC is narrowed to placements of a child in foster care or as a preliminary to adoption. Regulation No. 3, by contrast, calls for applying the ICPC "in situations that extend well beyond the commonly understood definitions of 'foster care' and placements 'preliminary to an adoption.' " Sankaran, *supra* at 72. By including

placement with a natural parent within the ICPC's reach, Regulation No. 3 conflicts with the express language of the ICPC and is invalid.

In conclusion, given the plain language of the ICPC and its legislative history, which demonstrate that its drafters intended to limit its reach to foster care/adoption situations, we hold that the trial court erred when it ruled that the ICPC applied to its decision to transfer the child to her natural mother. We, therefore, reverse and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

BRODERICK, C.J., and GALWAY and HICKS, JJ., concurred; DUGGAN, J., concurred specially.

DUGGAN, J., concurring specially. I concur with the majority's conclusion that Interstate Compact on the Placement of Children (ICPC) procedures are not required in this case. I write separately, however, because I would reach the same result by applying the ICPC regulations. *See* Association of Administrators of the Interstate Compact on the Placement of Children, *ICPC Regulations*, available at http://icpc.aphsa.org/home/regulations.asp (*ICPC Regulations*). I respectfully disagree with the majority's conclusion that the ICPC Regulations conflict with the plain language of the statute; I would therefore apply them to this case. This result is consistent with other states' treatment of the ICPC in out-of-state placements with non-custodial parents.

We interpret statutes in the context of the overall statutory scheme and not in isolation, *DaimlerChrysler Corp. v. Victoria*, 153 N.H. 664, 666 (2006), and should therefore interpret the ICPC to effectuate the purpose of the statute as put forth in Article I. The purpose of the ICPC is to ensure that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities . . . ." RSA 170-A:1, Article I(a) (2002).

The majority is concerned about conflicting language in the statute and the ICPC Regulations, particularly the potential of Regulation No. 3 to expand the application of the ICPC. The majority reasons that the Regulations' inclusion of parental placements within the ambit of those covered by the ICPC conflicts with the language of the statute, which the majority reads to apply only to non-parental placements. I read the ICPC to apply to out-of-state parental placements in very limited circumstances. If the purpose of the compact is to ensure that each child is placed in a suitable environment, it would make no sense, as more fully explained below, to read the ICPC to exempt from ICPC requirements the placement

of a child with a non-custodial parent who is actually unfit to care for the child or who has previously been deprived of custody for neglect or abuse. *See Appeal of N.H. Troopers Assoc.*, 145 N.H. 288, 290 (2000) ("We interpret a statute to lead to a reasonable result.").

Article VIII of the ICPC exempts placements with parents from ICPC procedures if a parent or guardian sends the child. RSA 170-A:1, Article VIII. Thus, if the sending entity is not a parent or guardian, the ICPC applies, regardless of who receives custody of the child. Regulation No. 3 mirrors this restriction. Regulation No. 3(6)(a) sets forth the requirements for a sending party in an exempt placement. It states that a placement with a parent will be exempt so long as the sending person or agency is one "whose full legal right to plan for the child: (1) has been established by law at a time prior to initiation of the placement arrangement, and (2) has not been voluntarily terminated, or diminished or severed by the action or order of any court." *Id.* This is simply a reiteration of ICPC Article VIII.

Regulation No. 3 also requires ICPC procedures if the receiving parent is found to be unfit. Regulation No. 3(6)(b) sets forth the requirements for the receiving party. It states:

> The compact does not apply whenever a court transfers the child to a non-custodial parent with respect to whom the court does not have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child.

Thus, under the Regulations, the limited placements with a non-custodial out-of-state parent that would require ICPC procedures would be those in which: (1) the sending person or agency has no authority to send the child (which is included in the text of the ICPC); (2) the receiving non-custodial parent has been found unfit by a court; or (3) the court retains jurisdiction over the child after the placement (which is not at issue in this case).

I agree with the majority that a regulation contradicting the terms of a governing statute has no effect. *See Kimball v. N.H. Bd. of Accountancy*, 118 N.H. 567, 568 (1978). If, however, a regulation does not exceed the authorizing statute's grant of power to the governing agency, and neither adds to nor detracts from the statute, it will be followed. *See Appeal of N.H. Dep't of Transportation*, 152 N.H. 565, 571 (2005). Article VII of the ICPC requires the executive to designate an officer who, "acting jointly with like officers of other party jurisdictions, shall have power to promulgate rules and regulations to carry out more effectively the terms and provisions of this compact." RSA 170-A:1, Article VII. I read Regulation No. 3 to be

consistent with the statutory grant of authority in Article VII and consistent with the text and purpose of the ICPC, and would thus apply it here.

The majority reasons that Regulation No. 3 is inconsistent with the ICPC statute because the former requires ICPC procedures for limited parental placements. Article VIII and the Regulation, however, have identical requirements for the sending entity. The only possible difference between Regulation No. 3 and the statute, therefore, is the Regulation's requirement that ICPC procedures be followed when a court finds the receiving parent to be unfit, or has previously deprived the parent of custody. If this is inconsistent with the text of the statute, then the statute must exempt from ICPC procedures placements with parents who are found to be unfit to care for the child. The legislature has stated that the text of the ICPC "shall be liberally construed to effectuate the purposes thereof." RSA 170-A:1, Article X. I cannot, therefore, read the ICPC to exempt from ICPC procedures placement of a child with a non-custodial parent who is actually unfit to care for the child or who has previously been deprived of custody for neglect or abuse. I would thus read Regulation No. 3 to be consistent with the ICPC.

Because the Regulations are not inconsistent, I would apply them in determining whether ICPC procedures apply to the facts of this case. In doing so, I look to other states' application of the ICPC. When courts have required compliance with the ICPC, they did so because there was evidence that the out-of-state parent was unfit to care for the child or had previously been deprived of custody by a court. *See, e.g., In re R.B.*, 647 S.E.2d 300, 304 (Ga. Ct. App. 2007) (ICPC applies when mother loses custody because of drug abuse and failure to provide adequate housing, then moves out of state and requests return of children); *Green v. Division of Family Services*, 864 A.2d 921, 928 (Del. 2004) (ICPC applies when out-of-state father with criminal record and no prior contact with eight-year-old child requests custody, raising concerns as to his fitness); *H.P. v. Department of Children and Families*, 838 So. 2d 583, 584 (Fla. Dist. Ct. App. 2003) (ICPC applies when out-of-state mother, who had lost custody in a divorce, requests custody); *In re T.N.H.*, 70 S.W.3d 2, 9 (Mo. Ct. App. 2002) (ICPC applies when out-of-state mother requests custody of daughter she abandoned eight years prior); *Arizona Dept. of Economic Sec. v. Leonardo*, 22 P.3d 513, 515 (Ariz. Ct. App. 2001) (ICPC applies when out-of-state mother, who lost custody in a divorce, requests custody); *K.D.G.L.B.P. v. Hinds County DHS*, 771 So. 2d 907, 913 (Miss. 2000) (ICPC applies when mother, who previously had custody taken away for neglect, leaves Mississippi with her children while still under State supervision, non-fatally stabs her husband in an argument, and then requests custody of the children in

Florida); *Adoption of Warren*, 693 N.E.2d 1021, 1025 (Mass. App. Ct. 1998) (ICPC applies when out-of-state father with substance abuse problems and "substantial criminal record" requests custody of child); *In re Paula G.*, 672 A.2d 872, 872-73 (R.I. 1996) (ICPC applies when mother, who had previously lost custody of daughter, takes her out of state and leaves her with a non-relative while still under State supervision). There was no such evidence in this case that the mother was unfit or had been previously deprived of custody.

In contrast, when courts have exempted parental placements from the ICPC, the facts of those cases do not reveal evidence that the out-of-state parent was unfit to care for the child. *See, e.g., Arkansas Dept. of Human Services v. Huff*, 65 S.W.3d 880, 888 (Ark. 2002) (not applying ICPC when trial court found out-of-state mother had complied with the case plan designed by DCYF); *In re Interest of Eric O.*, 617 N.W.2d 824, 830 (Neb. Ct. App. 2000) (not applying ICPC when court-appointed legal guardians moved out of state with children in their custody); *Tara S. v. Superior Court*, 17 Cal. Rptr. 2d 315 (Dist. Ct. App. 1993) (not applying ICPC when child services approved placement with out-of-state father and court did not retain jurisdiction).

In this case, the trial court specifically found that "[the State] has failed to prove that [the mother] has neglected the child as alleged in the petitions." In the absence of such a finding, Regulation No. 3(6)(b) exempts the placement of the child from ICPC procedures. This is consistent with the majority of cases that have interpreted the ICPC pertaining to interstate placements with noncustodial parents.

This reading of the ICPC and the ICPC Regulations is also consistent with New Hampshire law regarding the placement of children with noncustodial parents residing within the state. *See In re Bill F.*, 145 N.H. 267 (2000). If both the child's parents lived in New Hampshire, and DCYF wished to maintain custody of the child against the wishes of the noncustodial mother who has not been charged with abuse or neglect of the child, she could request a hearing. *Id.* at 274. The mother would have the opportunity to present evidence as to why she should receive custody, and "[would] be awarded custody unless the State demonstrates, by a preponderance of the evidence, that . . . she has abused or neglected the child or is otherwise unfit to perform . . . her parental duties." *Id.* This is essentially what happened in this case. The trial court heard evidence and decided that the State failed to prove the mother had abused or neglected the child. In light of such a finding, the parent "shall be awarded custody." *Id.* Because of that finding, ICPC procedures do not apply, as per Regulation No. 3(6)(b), and the child should be returned to her mother in Arizona. If, in this case, DCYF had not raised the question of the mother's fitness when it did,

but rather produced evidence at a later hearing that the mother was unfit, then, as the above cases show, the ICPC would have applied. Because, however, DCYF chose to challenge the fitness of both parents at a single hearing, resulting in a finding that the mother had not neglected or abused the child, ICPC procedures are not required in this case.

I thus concur with the majority's conclusion that ICPC procedures were not required in this case, but I would reach that result by applying the ICPC Regulations.