RENDERED: APRIL 29, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0273-DGE

A.G.                                                                                    APPELLANT

V.                              ON REVIEW FROM COURT OF APPEALS
                                          NO: 2018-CA-1218
                          JEFFERSON CIRCUIT COURT NO. 16-AD-500594

CABINET FOR HEALTH AND FAMILY                                          APPELLEES
SERVICES, COMMONWEALTH OF
KENTUCKY,
K.M. AND S.A.A.

## OPINION OF THE COURT BY JUSTICE LAMBERT

## REVERSING AND VACATING

The matter before us is a termination of parental rights action. The child's father, A.G., appeals the family court's order terminating his parental rights to his now sixteen-year-old son, S.A.A.  K.M., the biological mother, consented to the termination of her parental rights on the morning of the trial, did not testify at A.G.'s trial, and is part of the case only as a necessary party. After careful review, we reverse the Court of Appeals and vacate the judgment of the family court below.

## I.      FACTUAL AND PROCEDURAL HISTORY

Both A.G and K.M. were born in Somalia but met in Kenya in a refugee camp.  They married in 2001.  Their first child, a daughter, was born in 2002 and the young family legally immigrated to the United States in 2004.

Thereafter, the family added four other children and settled in the Kansas City, Missouri area. A.G. speaks Maay Maay, a dialect of Somali, and does not fluently speak, write, or read English. An interpreter was provided for A.G. at court proceedings. But as the court observed at the termination trial, neither the Cabinet for Health and Family Services (the Cabinet) nor the court sent him documents in his native language.

According to A.G., K.M. unilaterally decided to leave Kansas City and relocate herself and all five children to Louisville, Kentucky in October of 2013. Just a few months later, the family came to the attention of the court system in Kentucky.[1]

**A. Dissolution of Marriage Proceeding**

On June 10, 2014, A.G. filed a petition for dissolution of marriage and custody in Jefferson County, Kentucky and was granted a divorce from K.M. and joint custody pursuant to a decree entered on December 15, 2014. The decree noted that K.M. said that she fled the home because of domestic violence, and that A.G. said that K.M. mistreated the children. But the court did not make a factual finding on either allegation. Judge George awarded

---

[1] With Kentucky's Family Court System Model, each family is assigned to one family court judge, when possible, to provide for consistency and better outcomes. Each of the cases discussed herein (except for S.A.A.'s juvenile criminal cases) were filed in Jefferson County Family Court, Division 9. Given the span of years of court involvement for this family, however, Judge George, who was the initial judge through the early stages of the DNA proceedings, two individual domestic violence proceedings, and granted the divorce, retired. Judge Calvert then followed Judge George in the Division 9 seat.

primary custody to K.M., with unsupervised visits to A.G., and set his child support of $625.60 per month.

## B. Dependency, Neglect and Abuse Proceedings

In August 2014, the Cabinet filed a neglect petition against K.M. and a babysitter alleging both neglect and abuse of the children. Later, in December of 2015, a second neglect/abuse petition was filed against K.M. alleging that she failed to properly supervise her son, S.A.A. The petition alleged that she permitted him to accumulate 38 unexcused absences from school, that the child had been charged with arson, and that he was using drugs and running away, sometimes with his six-year-old brother.

The first neglect and abuse case against the mother was dismissed without prejudice by Judge George on October 1, 2014, on the condition that S.A.A. have no contact with the babysitter. No adjudication hearing was held and no stipulation to either abuse or neglect appears in the record.

The second neglect and abuse petition against the mother, trailer number two, was resolved by stipulation on February 17, 2016. The mother stipulated to dependency, but not to abuse or neglect. Allison Miller (Ms. Miller), the ongoing social worker and sole witness for the Cabinet, testified that A.G. was ordered to cooperate with an Interstate Compact for the Placement of Children (ICPC) home study and to maintain contact with S.A.A.[2]  A.G. was a non-

---

[2] The ICPC outlines the steps necessary for placing a child outside of his or her home state. *See generally* THE INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN (Am Pub. Welfare Ass'n), https://aphsa.org/AAICPC/text_icpc.aspx?WebsiteKey=1c52ac76-f593-4bbc-8980-1820609f983a. (last accessed March 15, 2021). The ICPC has been codified in

offending, out-of-state father and had not yet appeared in court on this action. Because S.A.A. was a child in need of services, he was placed in a therapeutic foster home where he received bi-weekly counseling. That dependency case gave rise to the current termination case against the father. S.A.A. was committed to the custody of the Cabinet on February 17, 2016, and has remained out of the home since that date. While no written case plan was entered into evidence, A.G. was told to: 1) maintain regular contact with S.A.A., and 2) cooperate with the completion of the ICPC home study. The record does not reflect how long S.A.A.'s criminal charges were pending and if the existence and duration of those charges influenced the initial decision of the court to have the Cabinet maintain temporary custody of him until those charges were resolved.

### C. Domestic Violence Proceedings

K.M. filed two domestic violence petitions against A.G. On August 10, 2015, Judge George found for A.G. and dismissed the first petition. The second petition was dismissed by Judge George without prejudice on November 9, 2015. Thus, no finding of domestic violence was ever made against A.G. in those proceedings.

---

Kentucky as Kentucky Revised Statute (KRS) 615.030 (Effective Until Contingency Is Met).

4

### D. Termination of Parental Rights

The Cabinet filed its petition for termination of parental rights against both parents on December 21, 2016. Of relevance to this appeal, a pretrial conference was held by the court on May 3, 2017. At that pretrial conference, Judge Calvert first saw the long awaited ICPC home study from Wisconsin.[3] The Cabinet attorney handed her the report in court and, by reading it, Judge Calvert discovered that A.G. had no criminal or abuse history.[4] Additionally, the ICPC home study was set up incorrectly because it considered the placement of all five children with A.G. rather than the one child at issue in the termination, S.A.A. At that time, the Cabinet indicated it was considering returning S.A.A. to the mother if she continued to improve but the judge noted that she did not "see any reason for this child to not go with his father, no reason whatsoever." But the Cabinet attorney stated that S.A.A. would not have any services set up for him in Wisconsin without the approved ICPC home study. The GAL[5] then suggested that another home study should be done only for S.A.A. When the judge asked why it was done this way, the Cabinet attorney said it was because all the children were in care. The Judge noted that this was a situation that was set up for failure and was a total waste of time

---

[3] A.G. had moved from Missouri to Wisconsin.

[4] The ICPC home study report does not appear in the record.

[5] Guardian ad litem.

The attorney for A.G., Mr. Helmers, asserted that his position from the beginning was that everyone knew that A.G. was the father and that he did not need an ICPC home study to have his children placed with him.

Ultimately, the family court terminated A.G.'s parental rights. The Court of Appeals affirmed the family court and we subsequently granted discretionary review.

## II. STANDARD OF REVIEW

Broad discretion is afforded to family courts to determine whether parental rights should be terminated, and our review is limited to a clearly erroneous standard.[6] And if the findings of fact are supported by substantial evidence, we shall not disturb the family court findings of fact and conclusions of law.[7]

## III. ANALYSIS

KRS[8] 625.090 sets forth all the requirements which must be met before a Kentucky court can involuntarily terminate a parent's rights to his or her child. And because of the heightened value of the right to parent a child,[9] this proof must be clear and convincing in nature. The statute requires critical findings:

---

[6] *M.P.S. v. Cabinet for Hum. Res.*, 979 S.W.2d 114, 116 (Ky. App. 1998).

[7] *Cabinet for Health and Fam. Servs.* v. *R.S.*, 570 S.W.3d 538, 546 (Ky. 2018).

[8] Kentucky Revised Statutes.

[9] *Santosky v. Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

1) that the subject child must have been found to have been abused or neglected by a court of competent jurisdiction;[10] and 2) the existence of at least one of the eleven listed grounds of subsection two, commonly called "aggravators";[11] and 3) the court must consider the best interest of the child and existence of grounds for termination factors, including whether the child

---

[10] KRS 625.090(1)(a)1 ("The Circuit Court may involuntarily terminate all parental rights of a parent of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that: (a)1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction.")

[11] KRS 625.090(2)(a)-(k) ("The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding; (a) That the parent has abandoned the child for a period of not less than ninety (90) days; (b) That the parent has inflicted or allowed to be inflicted upon the child, by other than accidental means, serious physical injury; (c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm; (d) That the parent has been convicted of a felony that involved the infliction of serious physical injury to any child; (e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child; (f) That the parent has caused or allowed the child to be sexually abused or exploited; (g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child; (h) That: 1. The parent's parental rights to another child have been involuntarily terminated; 2. The child named in the present termination action was born subsequent to or during the pendency of the previous termination; and 3. The conditions or factors which were the basis for the previous termination finding have not been corrected; (i) That the parent has been convicted in a criminal proceeding of having caused or contributed to the death of another child as a result of physical or sexual abuse or neglect; (j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights; or (k) That the child has been removed from the biological or legal parents more than two (2) times in a twenty-four (24) month period by the cabinet or a court.").

has been placed with the Cabinet, and whether the Cabinet has made reasonable efforts to reunify as defined by KRS 620.020.[12]

## A. Abuse or Neglect Findings

As reflected in the procedural history above, S.A.A. was never adjudicated to be an abused or neglected child in either of the two dependency, neglect and abuse cases, the two domestic violence cases,[13] or even the dissolution case. Therefore, the burden was on the Cabinet to prove that S.A.A. was abused or neglected by A.G. in this termination action. The Cabinet, via Ms. Miller, introduced certified copies of all the above case files, but failed to introduce any

---

[12] KRS 620.090(3)(a)-(f) ("In determining the best interest of the child and the existence of a ground for termination, the Circuit Court shall consider the following factors: (a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time; (b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family; (c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court; (d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child; (e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and (f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.")

[13] Nonetheless, counsel for the Cabinet argues that K.M. has "consistently testified that she fled Missouri with the children due to domestic violence perpetrated by the Movant." However, there are no citations to the record as to where this testimony appears. K.M. did not testify at the termination hearing.

8

other evidence that proved prior adjudication of abuse or neglect of S.A.A. or his siblings that supported the filing of their petition.

The court first made a finding of abuse and neglect against the mother, finding that S.A.A. and his siblings had been abused. However, the court cited evidence, against K.M., of proven domestic violence and inappropriate discipline and neglect and abandonment that did not appear in the record before us, nor in the submitted exhibits. The family court found that:

> [T]he totality of the evidence at trial is sufficient to convince this court that S.A.A. and his siblings have been abused or neglected within the meaning of KRS 600.020(1) while residing with K.M. This resulted from S.A.A. and his siblings being subjected to scenes of domestic violence in the home, to inappropriate discipline, to neglect of their material, emotional, and healthcare needs, and to having been abandoned for a period of not less than ninety (90) days.

As to A.G., the court found that:

> The Petitioner child has been further abused or neglected by A.G.'s failure or inability to comply with this court's remedial orders and the Cabinet's court approved case treatment plan so that the Petitioner child could be safely returned to parental custody, and by the failure or inability of the Respondent father to do what is necessary to materially support his child. While A.G. consistently testified that K.M. left Kansas City, Missouri with their children 'in the dead of the night' and he did not know where they had gone, K.M. has consistently testified that she fled with the children to Kentucky to escape domestic violence perpetrated by A.G. During the time until S.A.A. was placed into the custody of the Cabinet, the parents shared joint custody and A.G. did not request custody of S.A.A. even after the Cabinet was involved and he was aware of the concerns with K.M.'s parenting.

9

Fatal to these findings is that no evidence of domestic violence was proven in any of the cases which were submitted by exhibit. Nor did any witness testify at the trial to establish that any domestic violence occurred between the parties. Reasonable efforts would have required that those concerns be addressed in a written case plan with appropriate language access.

Additionally, the court found that the father had abandoned the child for more than ninety (90) days. However, Ms. Miller testified that A.G. maintained appropriate contact with her. S.A.A. testified that they spoke on the phone every week and that he wanted to maintain contact with his family, even if parental rights were terminated.

## B. Child Support

The Cabinet did not produce a child support order for either parent associated with the underlying dependency, neglect and abuse case or even the parties' divorce case. Ms. Miller testified that A.G. had provided money to S.A.A. a couple of times for shoes and "has been paying child support and maintaining sufficient contact with me." The only evidence as to a possible arrearage of child support was a comment made by counsel for A.G. that his client had told him about a notice of a tax refund interception.[14] Yet the court made a finding that "the Respondent father has not paid any substitute financial assistance since the Petitioner child has been in state care."

---

[14] A.G. did not bring the tax intercept letter to the trial.

10

There is no proof in the record that the state ever sought child support for S.A.A. from either parent. The Cabinet failed to proffer proof as to a court ordered amount of child support and any accrued child support arrearage for entry of judgment against A.G., as would be the right of the Commonwealth had they sought child support. Thus, this finding is clearly erroneous and not based on the evidence presented to the court.

## C. Interstate Compact for The Placement of Children

KRS 615.030 is Kentucky's codification of the ICPC. Its purpose is to establish uniform administrative procedures for the interstate placement of foster children. And as a part of that function, the sending state agency may request that a receiving state conduct a home study of a proposed placement for a child. Unfortunately, this Act has been misapplied many times over, resulting in great harm and delay to families.[15] In this case the ICPC had no application and caused much delay. Article III of the ICPC articulates "Conditions for Placement" and declares that

> (a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for <u>placement in foster care or as a preliminary to a possible adoption</u> unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state regarding the placement of children therein.[16]

---

[15] C. Nneka Nzekwu, *The Lost Ones of the Interstate Compact on the Placement of Children*, 44 Hofstra L. Rev. 1001, (2016); Vivek Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children,* 25 Yale L. & Pol'y Rev. 63 (2006).

[16] KRS 615.030 (emphasis added).

Article VIII, the "Limitations" section of the ICPC clearly sets forth that it shall

not apply to:

> (a) The sending or bringing of a child into a receiving
>     state by his parent, stepparent, grandparent, adult
>     brother or sister, adult uncle or aunt, or his
>     guardian and leaving the child with any such
>     relative or non-agency guardian in the receiving
>     state.[17]

When construing the intention of the legislature, we must look first to the plain

language of the statute.[18]  Because the language of the statute is plain and

unambiguous, we hold that the ICPC does not apply to interstate placements of

children with their biological parents.  We recognize that there is a split of

authority as to whether the ICPC home study approval process should apply to

biological parents, but join those states that conclude that the plain,

unambiguous language of the statute excludes its application to biological

parents against whom no credible allegations of abuse or findings of abuse or

neglect have been made.[19]

The United States Court of Appeals for the Third Circuit addressed the

applicability of the ICPC to biological parents in 1991 in *McComb v.*

---

[17] *Id.*

[18] *Seiller Waterman, LLC v. RLB Properties, Ltd.,* 610 S.W.3d 188, 203 (Ky. 2020).

[19] *See, e.g., Arkansas v. Huff*, 65 S.W.3d 880 (Ark. 2002); *In re C.B.*, 116 Cal. Rptr. 3d 294 (Cal. App. 2010); *In re Emoni W.*, 48 A. Ed 1 (Conn. 2012); N.E.3d 977 (Ind. App. 2020); *Matter of L.H.,* 142 *In re S.R.C.-Q.*, 367 P.3d 1276 (Kan. App. 2016); *In re R.S.*, 215 A. 3d 392 (Md. 2009); *In re Alexis O.*, 959 A.2d 179 (N.H. 2008); *State, Division of Youth and Family Servs. v. K.F.*, 803 A.2d. 721 (N.J. Super. A.D. 2002); *In Interest of C.R.-A.A..* 521 S.W.3d 893 (Tex. App.-San Antonio 2017); *In re Dependency of D.F.-M.,* 236 P.3e 961 (Wash. App. Div.1 2010).

*Wambaugh.*[20] The *McComb* Court examined the draftsman's notes supplied by the Council of State Governments.

> The detailed draftsman's notes, supplied by the Council of State Governments, reinforce the notion that the [c]ompact does not apply to parental placements. The notes state that [ICPC] Article VIII exempts certain close relatives. This was done in order to protect the social and legal rights of the family and because it recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control.[21]

In 2013, Kentucky enacted an updated version of the ICPC. To date, only thirteen of the thirty-five states required for effectiveness of the subsequent model act have adopted this version.[22] We note that the newer ICPC goes to additional lengths to both limit its application and to protect children who might be at risk by defining who is a noncustodial parent. It provides:

> "Noncustodial parent" means a person who, at the time of the commencement of court proceedings in the sending state, does not have sole legal custody of the child or has joint legal custody of a child, and who is not the subject of allegations or findings of child abuse or neglect[.][23]

---

[20] 934 F.2d 474 (3d. Cir. 1991).

[21] *Id.* at 481.

[22] ARK. CODE ANN. § 47.70.010; DEL. CODE ANN. tit. 31 § 381; FLA. STAT. § 409.408; IND. CODE § 31-28-6-1; KRS § 615.030; ME. REV. STAT. ANN. tit. 22 §4251 et. seq.; MINN. STAT. § 260.93; MO. REV. STAT. § 210.620; NEB. REV. STAT. ANN. § 43-1103; OHIO REV. CODE ANN. § 5103.20; OKLA. STAT. tit.10 § 577; WIS. STAT. ANN. § 48.99.

[23] Interstate Compact for the Placement of Children, KRS 615.030, Article II, §12 (Effective upon Contingency). This amended version of the ICPC will not take legal effect until 35 state have adopted the law.

Further, this language of the pending compact permits a family court to use its discretion to consider whether the noncustodial parent is then subject to credible allegations or findings of abuse or neglect, making that parent subject to an ICPC home study.

Here, prior to A.G. appearing in court in Kentucky, and after K.M. stipulated to S.A.A.'s dependency, Judge George ordered that an ICPC home study be completed on A.G.'s home. Since A.G. had not yet appeared in court, this order was certainly reasonable. S.A.A. was being safely maintained in a therapeutic foster home and was receiving much needed care and treatment. A.G. was a "noncustodial" parent at the commencement of the action in 2014, when K.M. had the second neglect/abuse petition filed against her. A.G. shared joint custody of S.A.A. and had unsupervised visitation pursuant to a divorce decree entered by the same court. With no allegations of abuse or neglect against A.G., he had the right to take S.A.A. into his care and seek appropriate care for S.A.A. in Wisconsin for the child's beyond control, delinquent, and criminal behaviors. It was also A.G.'s responsibility to assert his right to immediate custody to his child and he could have done so by the filing of an action pursuant to KRS 620.110.

ICPC home studies can create significant and unnecessary delays for a child and his or her family. Here, such delay created the very basis used for the termination petition filed against A.G. The Cabinet readily admitted at trial that its primary aggravator against A.G. was that S.A.A. was out of the home at least 15 of 22 months. Indeed, it had no issue with A.G.'s home when it placed

14

his four other children back with him on October 18, 2017, eight months before this termination hearing.[24] Instead, the court erroneously charged all the delay of the child's time in care against the father, even though the child was the one who initially needed services for his out of control behavior and most of the delay was attributable to obtaining the imprudently ordered ICPC home study. Once A.G. made his appearance, the court should have considered KRS 615.030 and its non-applicability to parents. Kentucky judges retain the authority under KRS 403.270(2) to make custody determinations based on the best interests of a child and priority for custody must be given to the parent of the child. While the revisions to the model ICPC and KRS 615.030 in 2013 attempted to clear some of the confusion surrounding its misapplication to parents, it is evident that in this case the court and Cabinet were mistaken in their understanding of what the law required.

We hold that an ICPC home study shall not be required for a noncustodial parent who is not the subject of allegations or findings of child abuse or neglect, pursuant to KRS 615.030. Because the court's findings were not supported by substantial evidence and much of the case against A.G. was based only upon his failure to successfully complete an unnecessary ICPC home study, the court erred in terminating his parental rights. Therefore, we reverse the Court of Appeals and vacate the judgment below.

---

[24] All four are the full siblings of S.A.A. Their DNA cases, alleging neglect against the mother, were pending in the same court and were referred to in this case at pretrial conferences.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

John H. Helmers, Jr.
Helmers & Associates

COUNSEL FOR APPELLEES:

Jennifer E. Clay
Cabinet for Health and Family Services

COUNSEL FOR MOTHER, K.M.:

Mark Hyatt Gaston
Louisville, Kentucky

COUNSEL FOR MINOR CHILD, S.A.A.:

Joseph S. Elder
Louisville, Kentucky