Olin **GREEN**, Alfred Gelman, and Sharon Taylor,[1] Respondents Below, Appellants,

v.

**DIVISION OF FAMILY SERVICES**, Petitioner Below, Appellee,

and

**Court–Appointed Special Advocate, Appellee.**

Nos. 590/594, 2003.

Supreme Court of Delaware.

Submitted: Oct. 6, 2004.
Decided: Dec. 14, 2004.

---

1. The names of the parties are pseudonyms assigned pursuant to Supr.Ct. R. 7(d).

Glynis Gibson (argued), of Gibson & No-wak, L.L.P., Dover, DE, for Appellants Olin Green and Alfred Gelman.

Gregory Morris (argued), of Liguori, Morris & Yiengst, Dover, DE, for Appellant Sharon Taylor.

James S. Reichert (argued), of the Department of Justice, Georgetown, DE, for Appellee Division of Family Services.

Mitchell W. May, of Street & Ellis, P.A., Dover, DE, for Court–Appointed Special Advocate.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

BERGER, Justice:

In this appeal, we consider whether the Family Court erred in terminating the parental rights of a mother and two fathers based on their failure to plan for their four children. Because the record amply supports the Family Court's findings, we affirm. We take this occasion, however, to address the question of whether the Interstate Compact on the Placement of Children (ICPC) applies to a non-resident parent seeking custody, since both fathers are Virginia residents whose ICPC home study evaluations were denied. We hold that the ICPC does apply to non-custodial natural parents in some circumstances, and that the placement requirements of the ICPC do not violate the parents' due process rights.

Factual and Procedural Background

Sharon Taylor had four children: Javone, Jamare, Hykeem, and Breshawn. Olin Green was the father of Jamare and Javone. Alfred Gelman was the father of Hykeem. All of the parents are from Virginia, which is where they were living in 1998, when the Northampton County Department of Social Services received its first complaint about one of Taylor's children. Javonne, who was then five years old, reportedly smelled bad and was filthy. The Department developed a service plan for Taylor that involved maintaining proper hygiene. Over the next three years, the Department provided services to Taylor in an effort to address the continuing hygiene problems as well as other problems, like Javonne's sporadic attendance at school, and the family's lack of adequate housing. In 2001, when the Department was about to seek custody of her children, Taylor moved to Delaware.

In February 2001, Delaware's Division of Family Services (DFS) began working with Taylor to provide the children with adequate housing, health care, food and other basics. Over the next few months, DFS entered into several case plans with Taylor, and provided, among other things, financial assistance and a Parent Aide. But Jamar and Javonne missed many days of school, and their living conditions did not improve. On June 28, 2001, when a caseworker came to visit, she found no food for the children. She told Taylor, who claimed to be employed and to have a paycheck waiting for her, to buy food for the children by the following day. When the caseworker returned the following day, there still was no food for the children. DFS immediately sought, and was granted, emergency custody.

In July 2001, DFS entered into another case plan with Taylor, under which Taylor was to improve her parenting skills, find steady work, and find appropriate housing. Despite assistance from DFS, Taylor failed to make progress. DFS entered into new case plans in September and again in De-

cember 2001, but Taylor showed no improvement. In May 2002, Taylor returned to Virginia and asked to have her children placed with her there. The Northampton Department did not approve the placement, however. In September 2002, Taylor moved back to Delaware, but by that time DFS had changed its goal from reunification to termination. The Family Court heard the petition for termination, as to Taylor and the fathers, in October 2003.

Green and Gelman traveled from Virginia to attend the Probable Cause Hearing in July 2001. Both expressed interest in obtaining custody of their children. Green returned twice in August 2001, and once in January 2002, to visit his children and discuss their placement. DFS requested that Virginia conduct a home study, but neither Green nor his family cooperated with the Virginia officials and the home study was never completed. After January 2002, Green did not visit his children again because his car was not running well and he had trouble arranging transportation.

Gelman extended himself more than Green. Virginia's social services caseworkers completed a home study for Gelman, but did not approve placement because of his criminal record. After learning of the denial, Gelman moved to Delaware in an effort to obtain custody of his son. In February 2002, Gelman entered into a case plan under which he was to participate in counseling with Hykeem, complete a parenting course, visit regularly, maintain regular employment, and find appropriate housing. During the next four months Gelman met all of the requirements of the case plan except one. According to Gelman, he was unable to find housing because the landlords would not rent to him until he had been in Delaware and working for six months.

Gelman had been living with his sister in Delaware. In June 2002, however, his sister accused Gelman of stealing some jewelry that she thought was missing. Gelman was so upset that he moved out immediately. In July 2002, he advised DFS that he had moved back to Virginia, and for almost eight months thereafter Gelman had no contact with DFS or his son. It appears Gelman's sudden departure devastated Hykeem, who became physically aggressive with children and adults. Hykeem has been through six foster homes and is being treated for several mental health problems including adjustment disorder and oppositional-defiant disorder. Gelman and his sister resolved their differences soon after he returned to Virginia, but Gelman decided not to come back to Delaware because he wanted to stay in his own home and he did not want to have to start over in terms of establishing his employment record.

After a three-day hearing, the Family Court terminated all the parties' parental rights for failure to plan. The trial court noted that the older children suffer from behavioral and medical problems that require consistent treatment, counseling, and, for one child, regular medication. The youngest child has been living with a foster family for most of his life and is thriving in that environment. Based on its evaluation of the childrens' needs and placement, the trial court concluded that termination would be in their best interests.

### Discussion

■ Based on our review of the record, we are satisfied that there is clear and convincing evidence supporting the Family Court's decision to terminate Taylor's parental rights. As the Family Court noted:

DFS has worked extensively with Mother providing her with necessities as well

as resources to turn her life around. While the Court is sympathetic to the uphill battle Mother has in overcoming poverty, the Court does not believe that poverty is the factor keeping Mother from being reunified with her children. . . . At this point Mother has not yet demonstrated even basic parenting skills. Mother has failed to complete the goals of the case plans. . . . Mother has four children who all have severe emotional and medical needs. Mother continually has failed to take these conditions seriously by not making doctors appointments, missing appointments that are scheduled, failing to get proper vaccinations, and failing to get the proper medications. . . . There is a history of lack of care and failure to terminate the relationship of parent and child will result in continued emotional instability and physical risk to the children.

The Family Court also carefully considered the best interests of the children and its conclusion is amply supported by the record.

We are not unmindful of Taylor's contention that her past parenting problems were caused by poverty, and that she is now financially secure. The record does not support her claim. First, financial assistance was available to Taylor from the time DFS became involved, but she failed to use the assistance she was given to provide for her children's welfare. Second, Taylor's contention that she is now financially secure is based on her engagement to a man who allegedly has his own home and the resources to care for her children. Taylor's fiance did not appear at the hearing, however, and there was no independent verification of his financial situation or his willingness to take responsibility for four children with medical and emotional problems. Accordingly, we find no error in the Family Court's decision terminating Taylor's parental rights in all of her children.

■ The record also establishes, by clear and convincing evidence, that Green and Gelman failed to plan for their children and that it is in the children's best interests to terminate their parental rights. Green made almost no effort to establish or maintain a relationship with Jamare and Javone. He visited them only three times between July 2001 and January 2002. Since then, he has had no contact with the boys. He did not cooperate with the Virginia caseworkers, and, as a result, they were unable to conduct a home study. In sum, Green has not been a father to his children. He has not given them any financial or emotional support; he has not attended to their needs; and he has not presented evidence of his willingness or ability to do so in the future.

■ Gelman made what appears to be a sincere effort to demonstrate his ability to care for Hykeem, for about four months. He moved to Delaware, cooperated with DFS, and, most importantly, developed a bond with his child. Unfortunately, Gelman was unable or unwilling to maintain that commitment. He returned to Virginia precipitously, and left Hykeem in emotional turmoil. Gelman admitted that, shortly after the argument that precipitated his departure, he could have returned to his sister's home in Delaware and resumed his involvement in Hykeem's life. But Gelman preferred to stay in Virginia, and he has had little or no contact with Hykeem since June 2002. Thus, the record establishes Gelman's failure to plan for Hykeem. In addition, given Hykeem's emotional and mental problems, the Family Court properly determined that it would be in the child's best interests to terminate Gelman's parental rights.

Green and Gelman do not seriously dispute the Family Court's findings or conclu-

sions as to their failure to plan for their children. They both argue, instead, that they were irreparably prejudiced by the fact that they reside in Virginia. Since both Delaware and Virginia have adopted the Interstate Compact on the Placement of Children (ICPC), DFS requested the appropriate Virginia authorities to conduct a home study for each father and to notify DFS whether placement with the fathers would be approved. Green's home study was denied because he and his sister (who lived in the same house) failed to meet with the caseworkers as scheduled. Gelman's home study was denied because Gelman lied to the caseworker about his criminal record and because the caseworker was concerned that Gelman would continue his criminal behavior.

Pursuant to Article III(d) of the ICPC,[2] a child may not be sent into another state for "placement in foster care or as a preliminary to a possible adoption" unless the "receiving state shall notify the sending agency in writing to the effect that the proposed placement does not appear to be contrary to the interests of the child." Thus, when the ICPC home studies were denied, DFS advised Gelman to move to Delaware and demonstrate that he could provide for his son.[3] Gelman did so for a few months, but abruptly left Delaware and never returned.

■ Gelman and Green contend that the ICPC should not apply to them because they are not seeking placement as foster parents or adoptive parents. They argue that, as the children's natural parents,

they do not have to be "approved" before being granted custody. *McComb v. Wambaugh*,[4] the leading authority supporting their view, holds that the ICPC does not apply to natural parents. Other, more recent decisions, however, hold that the ICPC does apply to non-custodial parents.[5] Applying a liberal construction to the terms of the ICPC, we are satisfied that it governs the children's placement with Gelman and Green.

The ICPC, which has been enacted by all states, is designed to facilitate cooperation in the interstate placement of children so that:

(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

(d) Appropriate jurisdictional arrangements for the care of the children will be promoted.[6]

---

**2.** 31 *Del. C.* § 381.

**3.** Green, apparently, did not do anything to obtain custody of his sons—either by moving to Delaware or by requesting, and this time attending, a third home study visit in Virginia.

**4.** 934 F.2d 474 (3rd Cir.1991).

**5.** *See, e.g.; Arizona Department of Economic Security v. Leonardo,* 200 Ariz. 74, 22 P.3d 513 (Ct.App.2001); *Dept. of Children and Families v. Benway,* 745 So.2d 437 (Fla.App. 1999); *Adoption of Warren,* 44 Mass.App.Ct. 620, 693 N.E.2d 1021 (1998).

**6.** 31 *Del. C.* § 381, Article I.

In *McComb v. Wambaugh,* the Third Circuit Court of Appeals considered whether the ICPC applies to natural parents. The guardian for a child, who was abused after being returned to his mother's care, argued that the ICPC applies to parents by virtue of a regulation that defines "placement" to include a situation where a court arranges for a child to be sent to a parent in another state [7]. The *McComb* court, applying Pennsylvania state law, held that the regulation was invalid, as the ICPC expressly governs only "placement in foster care or as a preliminary to possible adoption." [8] The court construed the ICPC narrowly, noting that: (i) Article VIII excludes from coverage children sent to another state by a parent or other close relative to be cared for by such a relative; and (ii) close relatives were exempted "in order to protect the social and legal rights of the family and because ... regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control." [9]

█ We decline to follow *McComb* because the ICPC directs that the Compact be liberally construed to effectuate its purpose.[10] Since its purpose is to protect children who are subject to placement in another state, the ICPC should be read to encompass placement of a dependent child with a non-custodial parent. As one court succinctly stated:

Once a court has legal custody of a child, it would be negligent to relinquish that child to an out-of-state parent without some indication that the parent is able to care for the child appropriately. The

ICPC provides an effective mechanism for gleaning that evidence and for maintaining a watchful eye over the placement.[11]

Moreover, the Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC), pursuant to authority granted in Article VII of the ICPC, adopted regulations that clearly include non-custodial parents. The regulations recognize both the need to protect dependent children and the natural parents' unique interest. Thus, for example, Regulation 3,¶ 1 defines "placement" to include "the arrangement for the care of a child in the home of his parent ... in a receiving state when the sending agency is an entity other than a parent, relative, guardian ...." Similarly, Regulation 3, ¶ 5 defines "foster care" to include "24–hour a day care ... provided by the child's parent(s) by reason of a court-ordered placement (and not by virtue of the parent-child relationship)...." But, under Regulation 3, ¶ 6, the ICPC's application to a natural parent remains limited:

6. (a) Pursuant to Article VIII(a), this Compact does not apply to the sending or bringing of a child into a receiving state by the child's parent, ... and leaving the child with any such relative ... in the receiving state, provided that such person who brings, sends, or causes a child to be sent or brought to a receiving state is a person whose full legal right to plan for the child: (1) has been established by law at a time prior to initiation of the placement arrangement, and (2) has not been voluntarily terminated, or

7. AAICPC Reg. No. 3,¶ 1.

8. 31 *Del. C.* § 381, Article III.

9. *McComb v. Wambaugh,* 934 F.2d at 481 (Citation omitted.).

10. 31 *Del. C.* § 381, Article X.

11. *Dept. of Children and Families v. Benway,* 745 So.2d at 439.

diminished or severed by the action or order of any court.

(b) The Compact does not apply whenever a court transfers the child to a non-custodial parent with respect to whom the court does not have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child.

These regulations recognize that a non-custodial parent, like Green or Gelman, may have had no involvement in the child's care prior to the time that the child is removed from the care of the other parent. In those circumstances, there may be a question as to the non-custodial parent's fitness to take over full responsibility for the child. In addition, public agencies in the receiving state may need to provide continuing assistance to, and supervision of, the child after placement. Thus, many of the same concerns that must be addressed before out-of-state placement with a "substitute" or foster parent, are also present with a non-custodial natural parent. By contrast, where the fitness of a non-custodial parent is not in doubt, and no continuing supervision will be necessary, the regulations authorize a court to hold the ICPC inapplicable to that parent.[12]

■ Based on the foregoing, we are satisfied that the regulations further the purposes of the ICPC, and that it does apply to Green and Gelman. The remaining issue is whether the ICPC deprives them of their due process rights. They contend, without any supporting authority, that they had no ability to appeal the denial of their ICPC home studies. In fact, they could have appealed those decisions in their home state of Virginia.[13] Thus, we find no merit to their due process claims.

## Conclusion

The judgments of the Family Court are hereby affirmed.

12. If a non-custodial parent questions the applicability of the ICPC, the Family Court should decide that issue at the outset in order to avoid the delay of obtaining a home study from the receiving state. Where such a home study is necessary, we note that Regulation 7 provides for court-ordered priority placement if the receiving state has not acted within 30 business days. Both of these provisions provide important protections for the rights of natural parents and should be carefully considered by the Family Court in each context.

13. *See:* Va.Code. Ann. 16.1–227.