# IN THE SUPREME COURT, STATE OF WYOMING

# 2024 WY 25

OCTOBER TERM, A.D. 2023

March 4, 2024

IN THE INTEREST OF: SK, MK, SK,
SK and WM, minor children,

MK,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

IN THE INTEREST OF: SK, MK, SK,
SK and WM, minor children,

JP-W,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-23-0172, S-23-0173

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant MK:*
    Brittany Thorpe, Domonkos & Thorpe, LLC, Cheyenne, Wyoming.

*Representing Appellant JP-W:*
    Jordan A. Surber, Coal Creek Law LLP, Cheyenne, Wyoming.

*Representing Appellee:*
    Bridget L. Hill, Attorney General; Christina F. McCabe, Deputy Attorney General; Wendy S. Ross, Senior Assistant Attorney General; April Jamison, Senior Assistant Attorney General; Catherine L. Reeves, Assistant Attorney General.

*Office of the Guardian ad Litem:*
    Joseph R. Belcher, Director.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    In these consolidated appeals, Father and Mother challenge the juvenile court's decision to change the permanency plan of their five children from family reunification to adoption or guardianship. We affirm.

### ISSUES

[¶2]    We combine the parents' issues on appeal:

1. Did the juvenile court abuse its discretion when it changed the permanency plan from family reunification to adoption or guardianship?

2. Did the juvenile court commit plain error when it allowed the Department of Family Services to employ the Interstate Compact on the Placement of Children mechanism to help it determine Mother's fitness for placement?

3. Did the juvenile court commit plain error when it allowed the Guardian ad Litem, rather than the State, to prove the grounds for the permanency change?

4. Did the juvenile court violate Mother's due process rights when it admitted evidence and witness testimony that was not disclosed by the Guardian ad Litem until shortly before the permanency hearing?

### FACTS

[¶3]    Mother and Father immigrated to the United States from West Africa in the early 2000s and had three children together, MK (2009), SK (2010), and SK (2011). Mother had two more children, SK (2013) and WM (2017), whose paternity is unconfirmed. The parents separated, and all five children lived with Father in Wyoming while Mother lived in Iowa.

[¶4]    In November 2019, law enforcement arrested and jailed Father for aggravated assault. The children were taken into protective custody. The Laramie County District Attorney's Office filed a neglect petition against Father, and Mother was later contacted and listed as the non-offending parent. A multidisciplinary team (MDT) was formed, a guardian ad litem (GAL) appointed, and the Wyoming Department of Family Services (DFS) placed the children in non-relative foster care.

1

Father's Case Plan and Progress

[¶5]    DFS outlined goals for Father in his case plan. He was to obtain appropriate and safe housing, complete a mental health evaluation, and follow the recommendations arising from the evaluation. DFS updated his case plan and required him to also complete a parenting class and stay in contact with the children's therapists to provide input and receive feedback about the children's needs.

[¶6]    Father struggled to obtain appropriate and safe housing. Father's attorney told the MDT Father "cannot commit to purchasing or renting a large enough place to accommodate all the children until he knows when they are coming back." Later Father was living in a homeless shelter in Fort Collins, Colorado and obtained a housing voucher. However, he did not want to use the voucher until he knew Mother's plans. DFS provided Father with information for six housing agencies, but Father reported none were able to help him. DFS also contracted with Family to Family to assist Father with housing, and the court appointed Families First Wyoming (FFW) to assist with services. FFW found a transitional homeless shelter, but Father would have needed full custody of the children to live there. After that, FFW reported Father did not reach out with requests or questions and made no contact with the organization. By October 2022, Family to Family had helped him apply for low-income housing but he encountered lengthy waitlists. In early 2023, DFS reported it had been unable to contact Father since September 2022.

Mother's Case Plan and Progress

[¶7]    At the start of this case, Mother was the non-offending parent, living in Iowa, and wanted the children to be placed with her. Although she had stable housing, a car, and employment, DFS identified "significant concerns of domestic violence" from records, reports, and evaluations in its predisposition report. For example, the oldest child reported witnessing domestic violence between Mother and Father as well as between Mother and Mother's husband, Chris Proctor.

[¶8]    Mr. Proctor had a significant criminal history, including DUIs, at least two child endangerment charges, and multiple domestic violence charges. At the start of this case, it was reported Mr. Proctor was incarcerated for committing domestic violence against Mother, which two of the children had witnessed.

[¶9]    Mother's case plan reflected these domestic violence concerns. The plan required her to complete domestic violence lessons to prevent future instances. She was also required to demonstrate the ability to protect herself and her children from potentially dangerous relationships.

[¶10] Her case plan further required Mother to complete a mental health evaluation and follow its recommendations. She was also to stay in contact with the children's therapists to provide input and feedback about the children's needs.

[¶11] Throughout the case, MDT members reported a language barrier and cultural differences, particularly with Mother. Mother could not read English or speak it very well. In 2022, the court appointed her a new attorney who obtained court authorization to add a translator to the MDT. The MDT noted that Mother's culture and customs, and in particular, her disciplining techniques, did not fit well with United States standards. The MDT had become aware of substantiated allegations of inappropriate and excessive discipline reported earlier in Nebraska, including "peppering," in which Mother would squirt peppers into the children's eyes, genitals, armpits, and buttocks and tie them up so they could not alleviate the pain. Mother's case plan required her to develop alternative discipline and parenting techniques.

[¶12] DFS used the Interstate Compact on the Placement of Children (ICPC) process to request Iowa authorities complete a home study. Initially, Mother passed this home study. But Iowa placed her ICPC application on hold after finding out about the substantiated allegations of excessive discipline and domestic violence in Nebraska. Her ICPC application was eventually denied because Mother failed to complete paperwork regarding these Nebraska abuse allegations.

[¶13] Mother moved to Cheyenne, Wyoming, after her Iowa ICPC application was denied. She was approved for housing funds through DFS. However, the funds were not cleared for several weeks, so Mother lost the house she had reserved. FFW helped her apply for housing and a job, but Mother was unable to find adequate housing for a large family in Cheyenne.

[¶14] Mother moved to Fort Morgan, Colorado, where she obtained a stable and well-paying job and a house big enough to meet her family's needs. By April 2022, reunification efforts were going positively. She was hosting unsupervised, weekend visits at her home, a new therapeutic team had joined the MDT, and the MDT hoped to expand visitation throughout the summer and place the children with Mother before school started in the fall. DFS submitted an ICPC application so Colorado's Department of Human Services (DHS) could complete a home study and help with supervision and services.

[¶15] Reunification efforts stalled that summer for two reasons; DHS denied Mother's ICPC application because Mother was not cooperating with the home study process, and Mr. Proctor had been released from jail. Although Mother obtained a protective order against Mr. Proctor, the MDT believed he continued to be present in Mother's home while the children visited. Consequently, visitation changed from unsupervised in Mother's home to supervised in Cheyenne. Mother denied Mr. Proctor had or would have

3

contact with the children and refused to come to visits for approximately five months before restarting visits in Cheyenne.

[¶16] DFS resubmitted Mother's ICPC application, and in January 2023, Mother's ICPC home study was approved. DHS recommended the children be returned to Mother under the direction of Wyoming DFS. DFS recommended two of the children, SK (2010) and SK (2011), be returned to Mother immediately and that the others transition to Mother over a few weeks so Mother would not be overwhelmed by having all five children returned to her home at once. SK (2010) and SK (2011) moved to Mother's home. The GAL objected, arguing placement with Mother was not in the children's best interests, and requested a hearing on the objection to occur during the scheduled evidentiary permanency hearing.

Evidentiary Permanency Hearing

[¶17] At the evidentiary permanency hearing, the GAL was the sole proponent for a change in permanency from family reunification to adoption. The State and parents advocated for the permanency plan to remain family reunification. The GAL called SK (2010), a visitation supervisor, and the children's therapists as witnesses. The children's therapists testified Mother made statements to the children about not wanting them and instructed them not to reveal that Mr. Proctor had been in her home. SK (2010)'s therapist testified SK (2010) reported Mother had physically assaulted her by kicking her in the shins. The court continued the hearing to March 10.

[¶18] Before the hearing resumed, an incident occurred between Mother and SK (2010) that began when SK (2010) refused Mother's request that she clean her room and culminated in a struggle in which, SK reported, Mother pushed her and she fell down. When the police responded to Mother's house, one of the officers reported seeing Mr. Proctor leave out the back door. Later that night, the police were again called to Mother's home after the GAL reported Mr. Proctor was at the home. The police left without seeing him. The next morning, DFS revoked the children's placement with Mother, and the children returned to Wyoming. Mother's attorney filed a request for an emergency status hearing, and the court agreed to address the issue on the second day of the permanency hearing.

[¶19] When the permanency hearing resumed, the juvenile court heard from more witnesses, including Sergeant Joe Hochanadel, who was called by the GAL. Sergeant Hochanadel responded to the incident at Mother's home and testified one of the officers saw Mr. Proctor leave the residence. He also testified he had twice before been in contact with Mother when Mr. Proctor had been at her home and he believed Mr. Proctor lived there. The GAL then called Jeanine Guilbert, Mother's Colorado caseworker. Ms. Guilbert testified the ICPC placement agreement had been denied due to safety concerns in Mother's home arising from the recent incident. In closing, the GAL continued to

advocate for the plan to change to adoption, while the State made no recommendation, deferring to the court's judgment. The parents maintained their positions the plan should remain reunification.

[¶20]  The court issued an oral ruling followed by a written order finding DFS had made reasonable efforts at reunification that were accessible, available, and appropriate. The court found it was in the best interest of the children to change the permanency plan from family reunification to adoption or guardianship, and relieved DFS of further reunification attempts. By this point, the children had been in DFS custody for over three years. Mother and Father each submitted a timely notice of appeal.

**I.     *The juvenile court did not abuse its discretion when it changed the permanency plan from family reunification to adoption or guardianship.***

*STANDARD OF REVIEW*

[¶21]  "To order a change in permanency from family reunification to adoption, a juvenile court must find that DFS made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest." *Int. of RR*, 2021 WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021) (citing *Int. of SW*, 2021 WY 81, ¶ 17, 491 P.3d 264, 269 (Wyo. 2021)).

[¶22]  "We review a juvenile court's change in permanency plan for abuse of discretion." *Int. of SRS*, 2023 WY 50, ¶ 21, 529 P.3d 1074, 1080 (Wyo. 2023) (quoting *Int. of SMD*, 2022 WY 24, ¶ 27, 503 P.3d 644, 652 (Wyo. 2022)). "A court abuses its discretion if 'it acts in a manner which exceeds the bounds of reason under the circumstances.'" *Id.* (quoting *Int. of SMD*, 2022 WY 24, ¶ 27, 503 P.3d at 652).

[¶23]  "In evaluating the sufficiency of the evidence in a neglect proceeding, we measure the juvenile court's decision against the preponderance of the evidence standard." *Int. of DT*, 2017 WY 36, ¶ 30, 391 P.3d 1136, 1145 (Wyo. 2017) (quoting *In re RE*, 2011 WY 170, ¶ 12, 267 P.3d 1092, 1096 (Wyo. 2011)). "When sufficiency of the evidence is challenged, we view the evidence in the light most favorable to the prevailing party, giving every reasonable inference to the prevailing party below, assuming all evidence favorable to the prevailing party is true, and discounting any conflicting evidence brought by the unsuccessful party." *Int. of SRS*, 2023 WY 50, ¶ 21, 529 P.3d at 1080 (quoting *Int. of SMD*, 2022 WY 24, ¶ 27, 503 P.3d at 652).

[¶24]  When determining whether DFS has made reasonable efforts, the court "must consider whether services to the family have been 'accessible, available and appropriate.'" *Int. of RR*, 2021 WY 85, ¶ 97, 492 P.3d at 270 (quoting Wyo. Stat. Ann. § 14-3-440(e)). "The Department's efforts must also be tailored to the distinct circumstances of each case." *Int. of MA*, 2022 WY 29, ¶ 30, 505 P.3d 179, 186 (Wyo.

2022) (citing *Int. of SW*, 2021 WY 81, ¶20, 491 P.3d at 270). However, when "determining what reasonable efforts shall be made with respect to a child and in making those reasonable efforts, the child's health and safety shall be the paramount concern." *Int. of JN*, 2023 WY 83, ¶ 14, 534 P.3d 455, 459 (Wyo. 2023) (quoting Wyo. Stat. Ann. § 14-3-440(b)). Further, "[a]n agency is not required to provide services indefinitely when a parent is either unable or unwilling to apply the instruction received." *Int. of SW*, 2021 WY 81, ¶ 26, 491 P.3d at 271 (quoting *In re R.T.*, ¶ 21, 778 A.2d 670, 681 (Pa. Super. Ct. 2001)).

## *DISCUSSION*

### A.    DFS made reasonable efforts to reunify the children with Father.

[¶25] Father contends the juvenile court abused its discretion when it changed the permanency plan because there was insufficient evidence to support the court's decision that DFS made reasonable reunification efforts.[1]

[¶26] When viewing all the evidence in the light most favorable to the State, we hold the juvenile court could have reasonably found DFS provided reasonable efforts and it was in the children's best interests to change the permanency plan. In its oral ruling, the juvenile court found DFS went "above and beyond" in providing reasonable efforts, and found a plan change would be in the children's best interests:

> The father in this case has also certainly been provided with services during the course of this 39 months this case has been open. He, of course, is the reason why . . . the children were taken into protective custody in the first place. Reasonable efforts were made to reunify with the father.
>
> . . .
>
> So the Court would find, based on the evidence it has heard, that it is in the best interest to change the permanency plan for all five children to adoption and guardianship.

[¶27] The record supports the juvenile court's findings as to reasonable efforts and the best interests of the children. Since the beginning of the case, Father's case plan required

---

[1] Father does not appeal the juvenile court's finding a change in permanency plan was in the best interests of the children.

6

him to obtain appropriate and safe housing, and the record does not support Father's assertion on appeal that DFS offered him little housing help. DFS gave Father six agencies to contact and contracted with Family to Family to assist him. FFW was also appointed as a MDT member, but Father communicated inconsistently with FFW and did not take housing opportunities when presented to him. Father has had over three years to find housing and has not. "Parents are not afforded an indefinite period to achieve their case plan goals . . . ." *Int. of SRS*, 2023 WY 50, ¶ 25, 529 P.3d at 1081 (citing *KC v. State*, 2015 WY 73, ¶ 38, 351 P.3d 236, 246 (Wyo. 2015)); Wyo. Stat. Ann. § 14-2-309(a)(v) (2021).

[¶28]  Housing has not been Father's only barrier to reunification. Father's case plan contained numerous other objectives. Although he completed some aspects of his plan, such as the parenting class and the mental health evaluation, he did not timely complete an updated release of information for his evaluation service provider, so DFS could not receive further information. Additionally, Father inconsistently attended visits and therapy with the children and did not communicate with the children's therapists.

[¶29]  The juvenile court found the services DFS provided were accessible, available, and appropriate. But on appeal, Father argues DFS did not do enough to help him, and merely provided him with resources to contact.

[¶30]  Father is correct that merely providing him with resources is not enough to prove reasonable efforts. *Int. of MA*, 2022 WY 29, ¶ 35, 505 P.3d at 187 ("Because the Department's efforts must 'go beyond mere matters of form, … so as to include real, genuine help[,]' one list of providers and a handful of reminders cannot be considered tailored, appropriate, or otherwise genuinely helpful.") (cleaned up) (quoting *Matter of BAD*, 2019 WY 83, ¶ 37, 446 P.3d 222, 232 (Wyo. 2019) (Fox, J., specially concurring)) (citing state cases). But as mentioned above, DFS did more than give him a list of resources. Father also conflates the amount DFS spent on housing to the amount of reasonable efforts provided to him, claiming very little money was spent towards helping him find housing, and DFS "could have bought [Father] and his five children a home for less money" than DFS spent on the case.[2] Father did not take opportunities presented to him, did not maintain consistent communication with FFW and DFS, and did not complete other aspects of his case plan that DFS had tailored to his and his children's needs. "[A] parent's failure to take advantage of available services, or to meaningfully participate in a case plan developed by DFS with [a parent's] input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful." *Int. of SW*, 2021

---

[2] Father also argues his socioeconomic status as a disabled refugee prevented him from finding housing, and parental rights cannot be terminated because of low socioeconomic status. While "being poor is not a disqualification to parenthood," Father was still required to make "adequate strides" on his case plan to show he could provide for his children's needs. *Int. of SRS*, 2023 WY 50, ¶ 26, 529 P.3d at 1081.

WY 81, ¶ 20, 491 P.3d at 270 (citing *Int. of JW*, 2018 WY 22, ¶ 21, 411 P.3d 422, 426 (Wyo. 2018)). The juvenile court did not abuse its discretion in changing the permanency plan.

## B.     DFS made reasonable efforts to reunify the children with Mother.

[¶31]   Mother contends the juvenile court abused its discretion when it determined DFS made reasonable reunification efforts that were accessible, available, and appropriate.[3] We disagree.

[¶32]   The juvenile court outlined the reasonable efforts DFS made towards reunification in its oral ruling:

> I would certainly find based on the evidence that I have heard that DFS has gone above and beyond. I really believe they have. They have made reasonable efforts to preserve and reunify this family. And pursuant to 14-3-440 Subparagraph (e), I would further find that the services that they have provided to the family have been accessible, available, and appropriate.
>
> Unfortunately, those reasonable efforts have not achieved the final goal in this case of reunification, but progress certainly was made. I don't think anybody can dispute that.
>
> . . .
>
> We had reasonable progress that was made by [Mother] in this case. That's indisputable. She had been approved for the placement in Colorado in late January. She had an appropriate house. She had a good job. She has transportation. She has the ability financially to meet the children's needs. She had enrolled in domestic violence counseling. She was doing the things that the Court wants to see her do.
>
> . . .

---

[3] Mother does not appeal the juvenile court's finding a change in permanency plan was in the best interests of the children.

8

> So I left the bench last Friday with having some concerns.
>
> . . .
>
> That was last Friday. Today was a different day.

[¶33]  On the final day of the hearing, the court found there was credible testimony "that in fact Chris Proctor has been living with [Mother] . . . for quite sometime." Further, the juvenile court weighed testimony of the Colorado DHS worker regarding "the fact that they are no longer . . . willing to continue to support placement of the two children with Mom in Fort Morgan" due to the physical altercations that had occurred between Mother and SK (2010) and Mr. Proctor's contact with the children. As a result, the juvenile court concluded reunification was no longer feasible.

[¶34]  Unlike Father, reasonable efforts as to Mother had been successful, except for one critical aspect; Mother could not part with Mr. Proctor. The juvenile court found this fact fatal to Mother's case. The record is clear that early in the case DFS was aware of domestic violence between Mother and Mr. Proctor, and DFS addressed these issues through Mother's case plan. Mother was to complete domestic violence education to prevent future instances of domestic violence, and she was required to demonstrate the ability to protect herself and her children from potentially dangerous relationships. Mother at first demonstrated she was following the case plan and could protect herself and her children; she separated from Mr. Proctor, filed for divorce from him, obtained a protective order, and attended domestic violence support and advocacy groups. But after Mr. Proctor's release from prison, Mother allowed him in the home despite the protective order, and Mother then dismissed the protection order and her divorce proceeding. In addition, Mother and SK (2010) had physical altercations. The juvenile court therefore did not abuse its discretion in finding DFS made reasonable, albeit unsuccessful, efforts to reunify Mother and her children.

[¶35] Mother raises several specific arguments challenging the adequacy of DFS's efforts. She contends DFS's efforts were not sufficiently tailored because DFS "did not articulate an appropriate reason" for placement outside of Mother's home. However, when DFS initially took custody of the children, Mother's location was unknown. Once DFS located and contacted Mother, DFS was required to assess Mother's suitability as the non custodial parent in accordance with its policy. *See* Wyo Dep't. Fam. Servs., Protective & Juv. Servs. Manual, https://drive.google.com/file/d/1r P0yOcbPXKn9Jl90Di JCLvPuA5yh2tl/view/ (last visited Feb. 29, 2024). By the time DFS filed is predisposition report, DFS had identified safety concerns relating to Mother, including "significant concerns of domestic violence[,]" and had tailored services through her case plan to address these concerns.

9

[¶36] Mother next argues MDT members did not do enough to make therapeutic services and visitation accessible, appropriate, or available. However, when Mother struggled to attend the children's individual therapy sessions due to her work schedule, the therapeutic team provided Mother with more scheduling flexibility. Yet DFS reported little effort by Mother to engage in the children's therapy. Mother later refused to attend her children's therapy sessions altogether and did not maintain contact with the children's therapists. As to visitation, Mother simply refused to attend supervised visits in Cheyenne for many months after Mr. Proctor was reported in her home.

[¶37] Mother finally contends DFS did not tailor its efforts to her unique circumstances as a Liberian immigrant. The juvenile court acknowledged cultural and language issues complicated the case. But the court found DFS went "above and beyond" in its efforts to preserve and reunify the family. The record shows DFS removed a parental capacity evaluation requirement from her case plan when the provider could not offer a culturally sensitive and effective evaluation.[4] FFW put Mother in touch with an African American attorney, who began representing her and helped the MDT obtain a translator. FFW also tailored goals to fit Mother's needs, and these goals included life coaching, to help her understand the court system and its requirements; mentoring, to help her navigate the system and help her with language barriers; and empowering, to help her address her fear of a system she did not understand.

[¶38] In addition to providing tailored cultural and language services, DFS filed a financial affidavit so Mother could obtain an attorney; provided her with an online domestic violence course; continuously helped her with the ICPC process; approved flexible funding to help her with security deposits and Cheyenne rent; assisted her in managing family disputes during visits; through FFW, facilitated visits and transportation; helped her obtain needed furniture and household items; and helped her plan to attend one of the children's medical appointments. The record supports the juvenile court's finding DFS properly tailored its efforts and provided accessible, available, and appropriate services, and the court did not abuse its discretion.

## II.  *The juvenile court did not commit plain error when it allowed DFS to employ the ICPC mechanism to help it determine Mother's fitness for placement.*

[¶39] Mother takes issue with the fact the children were not immediately placed with her after they were removed from Father's home. She argues the court violated her due

---

[4]Mother claims her services were not sufficiently tailored because DFS did not provide this parental capacity evaluation. However, the evaluation was substituted for a parent child interaction study when DFS determined no one in the state could complete a parental capacity evaluation sensitive to Mother's African culture. The parent child interaction studies were later removed from Mother's case plan.

process right to raise her children when it allowed DFS to employ the ICPC mechanism to help DFS determine her fitness for placement. She claims because the plain language of the ICPC does not apply to the placement of children with out-of-state parents, DFS did not need to ensure the ICPC requirements were met before placing the children with her.

## STANDARD OF REVIEW

[¶40]   "Due process claims are generally reviewed de novo." *Int. of BG*, 2023 WY 40, ¶ 8, 528 P.3d 402, 406 (Wyo. 2023) (citing *Verheydt v. Verheydt*, 2013 WY 25, ¶ 20, 295 P.3d 1245, 1250 (Wyo. 2013)). But because Mother "failed to address [her] due process rights to the juvenile court, our review of the issue is limited to a search for plain error."[5] *Id.* (citing W.R.A.P. 9.05; *Int. of ECH*, 2018 WY 83, ¶ 21, 423 P.3d 295, 302 (Wyo. 2018); *KC,* 2015 WY 73, ¶ 47, 351 P.3d at 248). "Plain error occurs when '1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice.'" *Int of BG*, 2023 WY 40 ¶ 29, 528 P.3d at 412 (quoting *Int. of DT*, 2017 WY 36, ¶ 23, 391 P.3d at 1143); *Int. of JG*, 742 P.2d 770, 775 (Wyo. 1987) (there must be "a 'clear and unequivocal rule of law[] which [the] particular facts…transgress[] in a clear and obvious, not merely arguable way'") (quoting *Jahnke v. State*, 692 P.2d 911, 928 (Wyo. 1984), *overruled on other grounds by Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998)). "[T]he appellant bears the burden of proving plain error." *Int. of BG*, 2023 WY 40, ¶ 29, 528 P.3d at 412. "Failure to establish each element precludes a finding of plain error." *Lott v. State*, 2022 WY 143, ¶ 10, 519 P.3d 646, 649 (Wyo. 2022) (quoting *Klingbeil v. State*, 2021 WY 89, ¶ 40, 492 P.3d 279, 288 (Wyo. 2021)).

## DISCUSSION

[¶41]   Mother argues the application of the ICPC violated her due process rights because there is a well-established constitutional right to make decisions concerning the care, custody, and control of her children. She claims this was violated because there is a presumption a fit parent acts in the best interest of their child under *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L.Ed. 2d 49 (2000). Because there were no safety concerns in her home at the beginning of the case, she was fit and presumably acted in the best interest of her children. Thus, she contends, placement with her was mandatory under Wyo. Stat. Ann. § 14-3-208(a)(iii), which provides DFS shall place a child with the child's noncustodial parent "[w]hen it is in the best interest of the child." We disagree. DFS had an obligation to assess Mother's fitness for placement, by employing the ICPC

---

[5] Mother objected to out-of-home placement in MDT meetings but did not raise this issue or mention due process to the juvenile court below.

process or by another means, and DFS found "significant concerns of domestic violence" early in the case.

[¶42] To address Mother's claim, this Court must provide some context regarding the ICPC. "Interstate compacts, like the ICPC, are formal agreements between the states that have the characteristics of both statutory law and contractual agreements. They are enacted by state legislatures adopting reciprocal laws that substantially mirror one another." *In re Alexis O.*, 959 A.2d 176, 180 (N.H. 2008) (quoting American Public Human Services Association, Understanding Interstate Compacts, available at http :// www.aphsa.org/Policy/ICPC REWRITE/Understanding% 20Interstate% 20 Compacts /UNDERSTANDING% 20INTRSTATE% 20COMPACTS.pdf.) The ICPC is an inter- state compact made up of ten articles that govern the placement of children from one state by a "sending agency" into the "receiving state." ICPC FAQ's, APHSA, https://apha .org/AAICPC/AAICPC/icpc_faq_2.aspx (last visited Feb. 29, 2024); Text of InterstateC ompact on the Placement of Children,Art. II, APHSA, https://aphsa.org/AAICPC/AAIC C/text_icpc.aspx (last visited Feb. 29, 2024). The Compact was created after a group of social service administrators and state legislators "recognized the inability of the judiciary to ensure a child's care beyond the borders of its own state." John C. Lore III, *Protecting Abused, Neglected, and Abandoned Children: A Proposal for Provisional Out-of-State Kinship Placements Pursuant to the Interstate Compact on the Placement of Children*, 40 Univ. Mich. L. Rev. 57, 72 (2006). The group found when a child was placed in another state, "the sending state could not compel the receiving state to protect the child and further, found that the receiving state could not compel the sending state to remain financially responsible for the child." *Id.* Now all 50 states, the District of Columbia, and the U.S. Virgin Islands have adopted the ICPC. ICPC FAQ's, APHSA, https://aphsa.org/AAICPC/AAICPC/icpc_faq_2.aspx (last visited Feb. 29, 2024). "As a legally binding agreement between all states, the ICPC ensures that children enjoy a uniform set of protections and benefits regardless of which state they are moving to or from[,]" and "[t]he primary purpose of the ICPC is to ensure that children placed out-of- state are placed with care-givers who are safe, suitable and able to meet the child's needs." *Id.* In Wyoming, the ICPC is enacted under Wyo. Stat. Ann. §§ 14-5-101 through 108.

[¶43] The placement of children under the ICPC involves several steps. ICPC FAQ's, APHSA, https://aphsa.org/AAICPC/AAICPC/icpc_faq_2.aspx#question5 (last visited Feb. 29, 2024). The sending state must provide written notice of the state's intention to place a child in a receiving state home. *Id.*; Text of Interstate Compact on the Placement of Children, art. III (b), APHSA, https://aphsa.org/AAICPC/AAICPC/text_icp c.aspx. (last visited Feb. 29, 2024). The receiving state's social services agency then completes a home study, and the placement request is either approved or denied based on the home study report recommendation. *Id.* The receiving state must notify the sending state in writing that the placement "does not appear to be contrary to the interests of the child." Text of Interstate Compact on the Placement of Children, art. III (d), APHSA,

No Violation of a Clear and Unequivocal Rule of Law

[¶44]  Despite this process, "[C]ourts have long disagreed on the range of 'placements' that are subject to the ICPC." Alex Jones*, Parents and the Interstate Compact on the Placement of Children: A Flexible Approach*, 25 Lewis and Clark L. Rev. 1021, 1023 (2021). In particular, courts have sharply split "over whether the ICPC applies when a sending agency places a child with the child's natural, non-custodial parent in another state." *Id*. Some courts have held a social services agency does not need to use the ICPC process to place a child with an out-of-state parent under the plain language of the ICPC. *Id.* The relevant language of the ICPC provides a child cannot be placed "in ***foster care or as a preliminary to possible adoption***" in the receiving state unless the sending state complies with the ICPC requirements. Wyo. Stat. Ann. § 14-5-101, art. II (a) (emphasis added). Additionally, the ICPC exempts parents from its processes: "***This compact shall not apply to*** *. . .* ***the sending or bringing of a child into a receiving state by his parent***, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian ***and leaving the child with any such relative*** or non-agency guardian in the receiving state." *Id*., art. VII(a) (emphasis added). Because a child's placement with a natural parent is not "foster care" or "a preliminary to a possible adoption[,]" and parents are exempted from the ICPC, some courts hold the ICPC does not apply to the placement of a child with that child's natural, out-of-state parent. *See, e.g.*, *McComb v. Wambaugh*, 934 F.2d 474, 482 (3d Cir. 1991) (the ICPC does not apply to a child returning to a natural parent who resides in a different state, in part, because as the statutory language of Article III is unambiguous); *In re Alexis O*, 959 A.2d at 182 ("The limited scope of the ICPC is evident throughout its provisions."); *Ark. Dep't. of Human Servs. V. Huff*, 65 S.W.3d 880, 888 (Ark. 2002) ("[W]e hold that the Compact, read as a whole, was intended only to govern placing children in substitute arrangements for parental care, such as foster care or adoption."); *In re Emoni W.*, 48 A.3d 1, 6 (Conn. 2012) (same); *In re Dependency of D.F.-M.,* 236 P.3d 961, 966 n.8 (Wash. Ct. App. 2010) (same).

[¶45]  Other courts have held a social services agency may use the ICPC process to place a child with the child's natural, out-of-state parent. These courts vary in reasoning, but many rely on the article of the ICPC that states "[t]he provisions of this compact shall be liberally construed to effectuate the purposes thereof." Wyo. Stat. Ann. § 14-5-101, art. IX; *Green v. Div. of Fam. Servs.*, 864 A.2d 921, 927 (Del. 2004) ("Since its purpose is to protect children who are subject to placement in another state, the ICPC should be read to encompass placement of a dependent child with a non-custodial parent."); *Dep't of Child. and Families v. Benway*, 745 So. 2d 437, 438 (Fla. Dist. Ct. App. 1999) (ICPC provision stating the ICPC "shall be liberally construed to effectuate the purposes thereof . . . supports the application of the ICPC to the out-of-state placement of a dependent child with his or her natural parent"); *see also Adoption of Knox*, 201 N.E.3d 737, 743 (Mass.

App. Ct. 2023) ("We agree that the language, by its terms, does not speak to the mother's situation, but this is not the end of the inquiry.").[6]

[¶46]   Other courts have found the ICPC process, as a practical matter, is a useful tool to help determine the suitability and safety of placement of a child with the child's out-of-state, natural parent. *See Benway*, 745 So. 2d at 439 (After a child is in legal custody of the state, "it would be negligent to relinquish that child to an out-of-state parent without some indication that the parent is able to care for the child appropriately. The ICPC provides an effective mechanism for gleaning that evidence and for maintaining a watchful eye over the placement."); *Ariz. Dep't of Econ. Sec. v. Leonardo*, 22 P.3d 513, 522 (Ariz. Ct. App. 2001) (ICPC provides a "free exchange of information between participating states in order to serve its primary goal—finding a safe placement for children across state lines by enlisting the assistance of the receiving state").

[¶47]   This Court has not yet joined the conversation over whether the ICPC applies to placement of a child with the child's out-of-state, noncustodial parent, and Mother urges this Court to do so here as a matter of first impression. We decline to do so in this case. Under our plain error standard, we cannot find the juvenile court transgressed a clear and unequivocal rule of law for the reason that this is an issue of first impression.[7]

[¶48]   The juvenile court did not transgress a clear and unequivocal rule of law when it allowed DFS to employ the ICPC mechanism to help it determine Mother's fitness for placement. *See State Int. of K.S.,* 512 P.3d 497, 507-09 (Utah Ct. App. 2022) (declining to decide whether the ICPC applies to an out-of-state, noncustodial parent under a plain error standard of review in part because the law is "far from plainly settled" and "the court needed to come up with some mechanism for inspection of Father's home in

---

[6] Certain courts have also relied on the regulations set forth by the Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC) to support the holding the ICPC applies to out-of-state, noncustodial parents. *Green*, 864 A.2d at 927 (finding that AAICPC "adopted regulations that clearly include non-custodial parents"); *Ariz. Dep't of Econ. Sec. v. Leonardo,* 22 P.3d 513, 521 ("[W]e hold that [the regulation] is consistent with and serves the policy and purpose of the ICPC."). However, not all courts agree the AAICPC regulations are binding. *See, e.g.*, *In re Emmanuel B.*, 175 A.D.3d 49, 57 (N.Y. App. Div. 2019) ("[W]e find that [the regulation] does not carry the force of law."); *In re S.R.C.-Q.*, 367 P.3d 1276, 1282 (Kan. Ct. App. 2016) ("[E]ven if we were to assume that [the regulation] promulgated by the AAICPC was validly enacted—which we doubt given that we have been unable to find any regulations issued by the Kansas coordinator of the ICPC—the language in [the regulation] impermissibly enlarges the application of the ICPC.").

[7] Mother correctly notes this Court's mention of the ICPC in *Int. of BG*, 2023 WY 40, 528 P.3d 402 (Wyo. 2023). In *Int. of BG*, this Court, in a footnote, acknowledged Wyoming had adopted and codified the ICPC. *Id.* at ¶ 16, n.2, 528 P.3d at n.2, 408 (citing Wyo. Stat. Ann. §§ 14-5-101 through 108). The footnote also referenced Wyo. Stat. Ann. § 14-5-101, art. VII for the proposition Wyoming's iteration of the ICPC excludes grandparents. *Id.* This Court did not give in-depth analysis into the ICPC and the rights of out-of-state, noncustodial parents under the Compact. *Id.*

Louisiana"); *Knox*, 201 N.E.3d at 743 ("[T]he mechanisms created by the ICPC" can be invoked by a child welfare agency or a judge in appropriate circumstances because "the statute provides a floor of protection, not a ceiling"). We cannot find the second element of plain error has been met.

No Prejudice

[¶49] Furthermore, Mother has not met her burden of proving material prejudice. "To establish material prejudice, [Mother] must demonstrate a reasonable probability exists that, absent the error, [s]he may have enjoyed a more favorable outcome." *Int. of VS*, 2018 WY 119, ¶ 37, 429 P.3d 14, 24 (Wyo. 2018) (citing *Osterling v. State*, 2018 WY 95, ¶ 7, 424 P.3d 250, 252 (Wyo. 2018)). Besides stating the ICPC delayed reunification, Mother has not presented argument or evidence contending she would have enjoyed a more favorable outcome had DFS not employed the ICPC mechanism to help with the home study and placement of the children in Mother's home. *Int. of DT*, 2017 WY 36, ¶ 29, 391 P.3d at 1145 (quoting *Peak v. Peak*, 2016 WY 109, ¶ 11, 383 P.3d 1084, 1088 (Wyo. 2016)). Thus, on this record, Mother has not demonstrated prejudice, and we find no plain error in the juvenile court's process.

[¶50] Mother's argument the application of the ICPC violated her due process rights is not supported under the plain error standard of review.

### III. *The juvenile court did not commit plain error when it allowed the GAL, rather than the State, to prove the grounds for the permanency change.*

#### STANDARD OF REVIEW

[¶51] Mother claims the juvenile court improperly allowed the GAL to prove the grounds for a change in permanency because the State is required to carry the burden of proof, and this violated her due process rights. Mother did not raise this issue below, so we review it for plain error. *Int. of BG*, 2023 WY 40, ¶ 8, 528 P.3d at 406 (citing W.R.A.P. 9.05; *Int. of ECH*, 2018 WY 83, ¶ 21, 423 P.3d at 302); *KC*, 2015 WY 73, ¶ 47, 351 P.3d at 248.

#### DISCUSSION

[¶52] The record is clear that it was the GAL who took the lead in presenting evidence and arguing for the change in permanency. While this is an unusual role for a GAL, it does not transgress a clear and unequivocal rule of law.

15

The GAL Role

[¶53]  The role of a GAL in Wyoming follows a "hybrid model," Wyo. State Pub. Defs. Rules & Regulations, ch. 2, § 2(a). A GAL is an attorney who is charged with representing not only the child but also the child's best interests. *Id.* This Court first acknowledged the hybrid role of the GAL in *Clark v. Alexander*, 953 P.2d 145, 153-54 (Wyo. 1998) ("If the attorney/guardian ad litem determines that the child's expressed preference is not in the best interests of the child, both the child's wishes and the basis for the attorney/guardian ad litem's disagreement must be presented to the court.") (citing *In re Marriage of Rolfe*, 699 P.2d 79, 86-87 (Mont. 1985), *aff'd Rolfe v. Rolfe*, 766 P.2d 223 (Mont. 1988)). The hybrid function of the GAL has since been codified. Wyo. Stat. Ann. § 14-3-211(a).

[¶54]  The scope of a GAL's duties is quite broad. This Court has specified "[t]he guardian ad litem should take an active part in all court proceedings." *Matter of GAC*, 2017 WY 65, ¶ 19, 396 P.3d 411, 416 (Wyo. 2017) (citing *Clark*, 953 P.2d at 154). At these court proceedings, the GAL "has the opportunity and the obligation to conduct all necessary pretrial preparation and present all relevant information through the evidence offered at trial. Recommendations can be made to the court through closing argument based on the evidence received." *Id.* (quoting *Clark*, 953 P.2d at 154). Further, it is the GAL's general responsibility to "[p]articipate in depositions, negotiations, discovery, pretrial conferences, multi-disciplinary team meetings and hearings, including review hearings[.]" Wyo. State Pub. Defs. Rules & Regulations, ch. 2, § 3 (viii). The GAL should also

> timely file pleadings when necessary, such as: petitions, reports, motions, responses or objections to advocate for the child's preferences and the child's best interests. Relief requested may include, but is not limited to:
>
> (C) Moving for or preventing a change of placement; [and]
>
> . . .
>
> (E) Change of the permanency plan.

Wyo. State Pub. Defs. Rules & Regulations, ch. 2, § 3 (xvi).

No Violation of a Clear and Unequivocal Rule of Law

[¶55]  The GAL objected to the State's decision to place the children with Mother, which is allowed under Wyoming Rules. Wyo. State Pub. Defs. Rules & Regulations, ch. 2, § 3 (xvi). She actively participated in the hearing and presented relevant information to the

16

juvenile court. The juvenile court then considered the evidence and arguments presented by all parties, including the GAL. Although the GAL exhibited unusually zealous behavior in her role as advocate for the five children, Mother does not identify any violation of clearly established law.

[¶56] Mother claims allowing the GAL to prove the grounds for the permanency change violated her fundamental right of familial association and the right to raise her children and to make decisions concerning their care, custody, and control. But the burden of proof was an incidental matter and is not a question of constitutional magnitude. *See Larsen v. State*, 2024 WY 4, ¶¶ 17, 21, 541 P.3d 444-45 (Wyo. 2024). Allowing the GAL to prove the grounds for the permanency change does not implicate or directly relate to how Mother's familial due process rights were violated. *Id.*

**IV.** **The juvenile court did not violate Mother's due process rights when it admitted evidence and witness testimony by the GAL that was not disclosed until shortly before the permanency hearing.**

[¶57] On the second day of the permanency hearing, the GAL presented three exhibits and witness testimony from Sergeant Hochanadel and Ms. Guilbert. The GAL sent Mother's attorney the exhibits the morning of the hearing. Mother's attorney objected as she had not had a chance to review them, nor had she been able to reach the Sergeant or Ms. Guilbert before the hearing. The juvenile court admitted the exhibits and allowed testimony from both witnesses. Mother claims the untimely disclosure of the exhibits and anticipated testimony from law enforcement violated her due process rights because she was unable to adequately prepare a defense, effectively cross-examine, or participate in a meaningful way. We find no due process violation.

### STANDARD OF REVIEW

[¶58] "The question whether the juvenile court afforded an individual due process is one of law subject to de novo review." *Int. of BG*, 2023 WY 40, ¶ 29, 528 P.3d at 412 (citing *Int. of DT*, 2017 WY 36, ¶ 23, 391 P.3d at 1143; *Verheydt*, 2013 WY 25, ¶ 20, 295 P.3d at 1250). "The party claiming an infringement of [her] right to due process has the burden of demonstrating both that [she] has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." *KC,* 2015 WY 73, ¶ 16, 351 P.3d at 241 (quoting *In re KMO*, 2012 WY 100, ¶ 30, 280 P.3d 1216, 1224 (Wyo. 2012)); *Int. of ECH*, 2018 WY 83, ¶ 46, 423 P.3d at 308 ("Due process 'is not a technical conception with a fixed content unrelated to time, place and circumstances. … [It] is flexible and calls for such procedural protections as the particular situation demands.'") (quoting *KC*, 2015 WY 73, ¶ 39, 351 P.3d at 246).

17

## DISCUSSION

Parental Rights at a Permanency Hearing

[¶59] "Generally, due process requires notice and an opportunity to be heard." *Int. of AM*, 2021 WY 119, ¶ 17, 497 P.3d 914, 920 (Wyo. 2021) (citing *Matter of TJH*, 2021 WY 56, ¶ 10, 485 P.3d 408, 412 (Wyo. 2021)). "The required process varies depending upon 'the nature of the proceeding and the interests involved.'" *Id.* (quoting *Int. of VS*, 2018 WY 119, ¶ 28, 429 P.3d at 22). "Parents are entitled to an evidentiary hearing when a proposed 'change in permanency plan includes adoption or permanent placement other than reunification.'" *Id.* (*quoting KC*, 2015 WY 73, ¶ 42, 351 P.3d at 247). At the evidentiary hearing, "Mother has 'a due process right to meaningful participation. . . .'" *Int. of DT*, 2017 WY 36, ¶ 28, 391 P.3d at 1144 (quoting *KC*, 2015 WY 73, ¶ 38, 351 P.3d at 246). Mother is "entitled to put the State to its proof, to be present, to confront and cross-examine witnesses, to call witnesses, and to present a case in support of a continued plan of reunification or dismissal of the case." *Id.* (quoting *KC*, 2015 WY 73, at ¶ 44, 351 P.3d at 247).

[¶60] Mother attended the permanency hearing and was afforded these rights: Mother's attorney made opening remarks, called and confronted witnesses, and presented closing argument. Although Rule 3 of the Wyoming Rules of Procedure for Juvenile Courts requires timely disclosure, W.R.P.J.C. 3(j), "as a practical matter disclosures must be and are routinely supplemented as additional information becomes available in these and other cases involving self-executing disclosure requirements. The rule accounts for the possibility of supplementation by providing that any information provided must be disclosed in time 'to permit its beneficial use.'" *In re MC*, 2013 WY 43, ¶ 34, 299 P.3d 75, 83 (Wyo. 2013) (citing W.R.P.J.C. 3(j)). When presented with the exhibits and witness testimony in question, Mother did not request a recess or seek a continuance, which may have been an appropriate remedy. *See In re MC*, 2013 WY 43, ¶¶ 45, 48, 299 P.3d at 85 ("The adjudicatory hearing was completed without a request for recess to meet unanticipated testimony, suggesting that Appellant's attorney was ready to challenge the State's case…any shortcomings could have been corrected by appropriate motions to compel, to continue, or for other appropriate relief.") (citing *Betts v. Crawford*, 965 P.2d 680, 685 (Wyo. 1998)) ("[T]he appropriate response from a surprised party who wishes to counter testimony is a request for a continuance, and the failure to request one precludes a claim of prejudice.").

The Exhibits

[¶61] Further, the record does not support Mother's contention she was unable to adequately prepare a defense because she had no previous knowledge of the information in each exhibit. Exhibit A contained a report from Iowa's Department of Human Services, which stated Mother had peppered her children. The other two exhibits related

to the incident at Mother's home, which had occurred days before the final day of the hearing. She was personally interviewed about the incident, and through her own emergency hearing request, she demonstrated knowledge of the allegations Mr. Proctor had been in her home and that DHS had terminated the children's placement with her. While the record is not clear whether Mother had seen these exhibits before, Mother knew the information contained in them. As to Exhibit A, Mother was clearly aware DFS believed her disciplinary methods were unacceptable. She had been interviewed about these allegations, her case plan required her to address her parenting and disciplining techniques, and references to Mother's disciplining techniques were found in permanency progress reports and in an MDT report. Thus, the admission of the exhibits did not violate Mother's due process rights. *See Int. of AM,* 2021 WY 119, ¶¶ 17-19, 497 P.3d at 920-21 (finding Mother had insufficient time to review the admitted exhibit but the juvenile court did not violate her due process rights because the information could be found in accessible MDT and Court Appointed Special Advocate notes and Mother had the opportunity to cross-examine, call witnesses, and present her case for reunification).

The Testimony

[¶62] We likewise do not find Mother's argument the untimely disclosure of Sergeant Hochanadel's testimony violated her due process rights.[8] Sergeant Hochanadel presented testimony about responding to the incident at Mother's home. He also testified he had previous contact with Mr. Proctor and Mother at Mother's residence and knew Mr. Proctor lived there. Mother was present at her home during the incident and during the Sergeant's former contacts with Mr. Proctor at her home. The information had been testified to, and she had the opportunity to vigorously cross-examine the Sergeant. There has not been a denial of fundamental fairness. Mother was not restricted in her ability to adequately prepare a defense, cross-examine, or participate in a meaningful way.

## *CONCLUSION*

[¶63] We affirm the juvenile court's change of permanency plan from family reunification to adoption or guardianship. The juvenile court did not abuse its discretion when it changed the permanency plan. It did not commit plain error when it allowed DFS to employ the ICPC mechanism to help DFS determine Mother's fitness for placement or when it allowed the GAL to prove the grounds for the permanency change. Lastly, the juvenile court did not violate Mother's due process rights when it admitted evidence and witness testimony by the GAL that was not disclosed until shortly before the permanency hearing.

---

[8] Although the GAL also called Ms. Guilbert to testify on the second day of the hearing, Mother does not present argument on how Ms. Guilbert's testimony violated her due process rights.

19